**DANNER et al. v. CARNEY et al.**
No. 3398.

Circuit Court of Appeals, Tenth Circuit.
March 19, 1947.

---

Roy F. Ford, of Tulsa, Okl. (M. A. Breckinridge, Byron V. Boone and D. M. Saunders, all of Tulsa, Okl., on the brief), for appellants.

Logan Stephenson and John T. Gibson, both of Tulsa, Okl. (F. C. Swindell and Q. M. Dickason, both of Tulsa, Okl., on the brief), for appellees.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This was an action by J. E. Danner and Fay Thompson against A. B. Carney and J. O. Lowe, to recover $250,000.00, the amount which they claimed was due them under the terms of a written contract, or, in the alternative, damages in a like sum for its alleged breach by the defendants.[1] Plaintiffs have appealed from a judgment in favor of defendants.

The Douglas Aircraft Company operated an aircraft manufacturing plant at Santa Monica, California. In 1941 it was awarded a contract for the operation of a similar manufacturing plant then in the process of construction by the federal government in Tulsa, Oklahoma. It employed a large number of workers in each of these plants for this purpose. It had a medical plan in operation in its Santa Monica plant, under the provisions of which, so far as necessary to note, each employee who subscribed thereto paid $1.50 per month into the medical fund, in return for which he received designated medical and hospital services in case of sickness. Monthly payments were deducted by the company from the employee's pay check and were then paid to the doctors charged with the operation of the plan.

The defendants, Dr. Carney and Dr. Lowe, maintained a hospital and clinic in Tulsa where they practiced their profession. Fay Thompson had been employed by them for a number of years as business manager. Danner at the time was employed at Stillwater, Oklahoma, as a government instructor in aircraft skills. He became acquainted with Fay Thompson and through her consulted Dr. Carney professionally about the time of the events involved in this action.

Prior to coming to Oklahoma, Danner had been employed in the Santa Monica plant of the Douglas Aircraft Company where he had subscribed to the medical plan in operation there. While he worked there he became ill and had occasion to consult Dr. C. E. Rooney, who was in charge of the plan there. In the course of his social contacts, Danner mentioned the Santa Monica medical plan to Fay Thompson, who in turn brought it to the attention of her employers. Danner tried to interest Dr. Carney in obtaining the right to institute a medical plan in the Tulsa plant when it should be placed in operation. At Danner's request, Dr. Carney accompanied him to the Mayo Hotel in Tulsa to meet several representatives of the Douglas Aircraft Company to consult them about the institution of such a plan in the Tulsa plant. He was informed that Dr. Rooney, who was the medical director of Douglas Aircraft Company, had authority in regard to any medical plan which might be instituted at Tulsa. Danner thereafter asked Dr. Carney for expense money to go to California to consult Dr. Rooney in an effort to obtain an agreement authorizing them to institute such a plan, but Dr. Carney refused to advance any expense money. Thereafter, about June 1, 1941, Danner and Fay Thompson made the trip together to California at their own expense to attempt to procure authority from Dr. Rooney to permit the defendants to institute such a plan at Tulsa.[2] Danner told Dr. Rooney about

---

[1] The parties will be referred to herein either by their names or as plaintiffs or defendants as they appeared in the court below.

[2] Danner and Fay Thompson had married prior to this time, although at the time of this suit they were divorced.

the arrangements he had with the defendant doctors for the operation of the plan if permission were granted them to operate. He was told that Dr. Rooney had no interest in any arrangement between him and the defendant doctors. No commitment was obtained from Dr. Rooney at that time.

After the return from California, the parties carried on negotiations, and about July 3, 1941, the contract which forms the basis of this action was executed between Danner and the two defendant doctors. Danner was named therein as the "first party", and the two doctors as the "parties of the second part." The first paragraph of the contract recited that: "Whereas, the first party does have the exclusive approval and recommendation of the officers of the Douglas Aircraft Company, Inc., for the installation and placing in operation in the Douglas Bomber Plant at Tulsa, Oklahoma, of the 'Aircraft Workers Medical Plan' as now in operation at the Douglas Aircraft Company Plant in Santa Monica, California; and

"Whereas, the parties hereto wish to organize the same plan of operations and make it effective for the employees of the Douglas Bomber Plant at Tulsa, Oklahoma, * * *."

So far as material, Danner agreed: (1) That he would solicit employees and secure applications of membership from them. (2) That he would maintain an office and an office staff to keep accurate and complete records on all memberships paid and that were active. '(3) That within twenty-four hours of obtaining the intention of employee to become a member, he would notify the second parties of all such subscribers. (4) That he would provide all necessary forms to accomplish the same and would receive the payments from the Douglas Aircraft and make remittance to the second parties, together with a complete list of payments, within twenty-four hours after receiving the same. (5) That he would furnish surety bond for himself and all employees who handled funds, in the sum of $7,500. The defendant doctors agreed in the contract to furnish the medical and hospital services provided for therein. It was agreed that Danner was to receive 24% of the payments made by the employee members and that the doctors were to receive 76% except that when there were more than 10,000 paying members, Danner was to receive 34% and the doctors were to receive 66% of such payments. It is to recover the sum represented by these percentages that this action was instituted.

The contract contained this further provision which it is necessary to note:

"It is further agreed by and between the parties that the first party has and does represent to the second parties, and that such representation is of a nature as to constitute a warranty that he does now have and will continue to have during the life of this contract, the exclusive right to use the aforementioned 'Aircraft Workers Medical Plan,' and that such right shall be exclusive to the parties hereto, and the first party represents that his agreement with the said Douglas Aircraft Company is to the effect that they will not permit the operation in the plant of any other similar plan, or will they permit in the plant any solicitation by any organization of any kind or character of any similar plan or plans, or of any plan designed to give to said workers the same or similar type of service."

The record contains much evidence relating to other contentions of the parties which we do not set out, because in the view we take of the controversy, it is not necessary to a determination of the issues. It is conceded that after the execution of the contract Danner did none of the things he was required to do thereunder. He did not establish an office, provide necessary forms, nor did he furnish the bond specifically required of him. But again, the decision does not depend upon whether these failures under all the testimony in the record justified a cancellation of the contract.

Danner did represent to the defendants that he had the exclusive approval and recommendation of the officers of the Douglas Aircraft Company, Inc., for the institution and placing in operation of the Aircraft Workers Medical Plan as operated in the

Santa Monica plant. This representation was of the essence of the contract. This was what induced the defendant doctors to enter into the contract with him. This is what induced them to agree to give him from 24 to 34 per cent of the amount received by them from the medical fund. That this representation was relied upon by the defendants and was what induced them to enter into the contract with Danner is evidenced by the provision of the contract which made these representations warranties. That Danner did not have such exclusive authority and approval of the Douglas Aircraft Company, Inc., is without dispute in the record. He not only lacked exclusive authority and approval of the Douglas Aircraft Company, Inc., but he was without any authority or standing whatever. He was a stranger to the officers of the company. The only contact he had ever had with any of the officers of the company was with Dr. Rooney, and that was merely as a patient under the medical plan in operation at the Santa Monica plant while he was an employee therein.

It is conceded that no medical plan could have been instituted at the Douglas plant without the approval of Dr. Rooney, the medical director of the company. Dr. Rooney testified positively that Danner had no authority from him to institute such a plan. Dr. Carney testified that he entered into the contract with Danner in good faith and in the belief that Danner had the exclusive right to institute the plan in the Tulsa plant. He testified that about December, 1941, he ascertained for the first time that Danner had no authority which would give him the right to institute the plan at the Tulsa plant, and that thereupon he notified Danner that their contract was at an end, and thereafter obtained authority from Dr. Rooney to operate the plan at the Tulsa plant.

It is contended that in any event the defendants waived the right to rescind. Plaintiffs rely for this position upon a letter which Dr. Carney wrote Dr. Rooney under date of November 17, 1941. Inasmuch as this letter is prior to the time Dr. Carney testified that he ascertained that Danner did not have the authority which he claimed, it could not form the basis of a valid waiver and its contents will therefore not be noted. It is sufficient to say that there is nothing in the letter which would indicate that Dr. Carney then knew of the lack of authority on the part of Danner.

It is the settled law of Oklahoma that upon the discovery of fraud or material misrepresentation which induced the execution of a contract, the aggrieved party may rescind and repudiate the contract if he acts promptly.[3] Dr. Carney acted promptly upon discovery of the fraud, and was entitled to rescind the contract.

The parties are in disagreement as to whether the contract created a joint adventure. In view of what we have said, it is not necessary to resolve this conflict, because even though it be conceded that such a relationship was created, the contract was nevertheless subject to rescission for material fraud and misrepresentation which induced its execution by the defendant doctors.

Fay Thompson was not a party to the contract. She claims her interest in the contract under an arrangement with Danner, but her interest of necessity must fall with his.

The judgment of the trial court is accordingly affirmed.

---

[3] See G. A. Nichols, Inc., v. Karnes, 188 Okl. 28, 106 P.2d 125; Bowersock v. Barker, 186 Okl. 48, 96 P.2d 18, 127 A.L.R. 130; Dusbabek v. Bowers, 173 Okl. 53, 43 P.2d 97, 47 P.2d 141; Miles v. Parkinson, 196 Okl. 414, 165 P.2d 644.