

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-2009

# Govt of VI v. Davis

Precedential or Non-Precedential: Precedential

Docket No. 07-2136

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Govt of VI v. Davis" (2009). *2009 Decisions.* Paper 1614.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1614

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————

No. 07-2136

————

GOVERNMENT OF THE VIRGIN ISLANDS

v.

JIMMY DAVIS,

Appellant

————

On Appeal from the District Court of the Virgin Islands
Division of St. Thomas – Appellate Division
(D.C. No. 02-cr-00085)
District Judges:  Honorable Raymond L. Finch
and Honorable Curtis V. Gomez
Superior Court Judge:  Honorable Maria M. Cabret

————

Argued December 9, 2008
Before:  FISHER, JORDAN and
STAPLETON, *Circuit Judges*.

(Filed: March 27, 2009 )

Brett G. Sweitzer (Argued)
Defender Association of Philadelphia
Federal Court Division
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA  19106
       *Attorney for Appellant*

Matthew C. Phelan (Argued)
Office of Attorney General of Virgin Islands
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
Charlotte Amalie
St. Thomas, VI  00802
       *Attorney for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Jimmy Davis appeals from an order entered by the Appellate Division of the District Court of the Virgin Islands affirming his conviction for four counts of first-degree assault, one count of first-degree reckless endangerment, and one count of unauthorized possession of a firearm during a crime of violence.   Davis argues on appeal that the prosecutor's

references during trial to his post-arrest, post-*Miranda*[1] silence violated his right to due process and that, because this error cannot be considered harmless on this record, he is entitled to a new trial. We agree and therefore will reverse and remand.

## I.

On December 23, 2001, a drive-by shooting occurred at the intersection of Estate Whim Road and Queen Mary Highway on St. Croix in the United States Virgin Islands. Davis was arrested on January 3, 2002. The Government issued an information in which it alleged that Davis fired gun shots at Shawn Francis, Sean Petrus, Erica Parrilla, and the daughter of Francis and Parrilla, Shanadalis, with the intent to commit murder. A jury trial commenced in the Territorial Court of the Virgin Islands on April 15, 2002.[2]

---

[1]*See Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]When this case was tried, the trial court was known as the Territorial Court and appeals were reviewed by the Appellate Division. However, since then, the Virgin Islands Legislature has changed the trial court's name to the Superior Court of the Virgin Islands and established the Supreme Court of the Virgin Islands. Nonetheless, pending decisions of the Appellate Division may be reviewed by this Court. *See generally Edwards v. HOVENSA, LLC*, 497 F.3d 355, 358-59 & n.2 (3d Cir. 2007).

During trial, the Government introduced the testimony of Francis, Petrus, and Parrilla, each of whom had prior relationships with Davis. The three witnesses gave a similar account of the shooting. Specifically, they were traveling in Francis's pickup truck, with Francis driving, Parrilla and Shanadalis in the front seat, and Petrus in the back of the truck. While Francis's vehicle was idling at the intersection another pickup truck approached. Davis was riding in the back of the second truck and was the only passenger in the truck bed. Suddenly, multiple gunshots were fired from the passing truck at Francis's vehicle. Parrilla testified that she ducked and covered Shanadalis and heard three shots, but admitted that she did not see who fired the shots. Petrus and Francis both identified Davis as the shooter. Three bullets hit the driver's area of Francis's truck, one bullet striking the windshield and the other two bullets striking the door, though none of the four individuals in Francis's truck was injured. After the shooting, the witnesses returned to Francis's house and viewed the damage to the truck, but did not report the incident to the police until the next day.

Following the Government's case-in-chief, Davis took the witness stand and provided a different account of the shooting. On direct examination, Davis admitted that he was riding in the truck from which the shots were fired, but testified that an individual named "Goofy," whom he insisted was in the back of the truck with him, had pulled the trigger. According to Davis, "Bugsy" was driving the truck, Davis's brother Hector was in the passenger seat, and Davis and Goofy were in the back of the truck. When the truck approached Francis's vehicle, Goofy fired the first shot at Francis but Francis then pulled a

4

gun and returned fire, at which point Davis ducked for cover. Davis stated that he saw only Francis and Petrus in the other truck, and that Petrus was riding in the passenger seat, not in the back.

During cross-examination, the prosecutor questioned Davis about whether he had told the police this version of the story after his arrest:

> Q: You were arrested, sir, were you not approximately a week after this incident, December 23; is that correct?
>
> A: Afterward.
>
> Q: After you were arrested in this case, sir, you did not make any statements to the police. Did you concern yourself whether or not Goofy, and not you, fired the shots on December 23?

Defense counsel objected, but the Territorial Court overruled the objection. The prosecutor continued:

> Q: Mr. Davis, do you understand the question?
>
> A: Repeat.
>
> Q: After you were arrested in this case you never made any statement to the police.

5

Did you concern yourself that it was Goofy, and not you, that fired the shots on December 23?

A:     The police never asked me for no statement.

Q:     You understand my question?

A:     Yes. They say they don't have a warrant for my arrest.

Q:     My question was, did you ever make any statements to the police that it was Goofy, and not you, that fired the shots; yes or no?

A:     No.

Q:     And since the time of your arrest up until the present time, now April, have you ever supplied any information to the police about who Goofy is; where he can be found in relation to what you said happen here; yes or no?

Defense counsel again objected and argued at sidebar that the prosecutor's line of questioning was fundamentally unfair. The Territorial Court overruled the objection and, after allowing the court reporter to read back the previous question, permitted the prosecutor to proceed:

6

Q: Mr. Davis, answer the question please.

A: No. I didn't give no statement to the police.

Q: About Goofy?

A: About nobody. The police never ask me.

Q: I understand.

On redirect, defense counsel addressed the prosecutor's questioning about Davis's post-arrest silence:

Q: Now, [the prosecutor] asked you whether or not you had any contact with the police officers between the time you were arrested and today's date; you remember that question?

A: Yes.

Q: Sir, when you were arrested what happened?

A: The police – how you mean?

Q: When you[] were arrested you were taken to jail?

7

A:      Straight to jail. I went to fingerprint and
        straight to jail.

Q:      You have not been released since?

A:      No.

Q:      When you were arrested did the police not
        tell you, you have a right to remain silent?

A:      Yes.

Q:      And you understand that to mean you
        didn't have to talk to any police?

A:      Until attorney present.

Q:      Now, since that time no police has come to
        talk to you?

A:      No.

During summation, the prosecutor focused on Davis's failure to inform the police that another individual ostensibly fired the shots. Most notably, the prosecutor stated to the jury:

As you retire into your jury room I want you to think about the credibility of all the witnesses that put their credibility in issue and took the stand here during this trial. I want you to ask yourself can I believe this person? Why should I believe

8

this person? Is there a reason why I should disbelieve this person? . . . Consider your own common experiences and common sense when thinking about on cross-examination. I asked Mr. Davis between January and April, now, have you ever supplied the police with any information concerning where Goofy can be found so the police can arrest him? Where Goofy can be located? Have you ever given? No, no, no. Can you believe that? . . . [I]f the truth was really the truth there was a guy named Goofy and somebody else fired the shots, would you not use everything within your power if it was the truth to notify the police to at least give them a statement that would exonerate yourself. No he didn't do it . . . .

The jury found Davis guilty on all counts and the Territorial Court entered judgment and sentence on August 14, 2002.

Davis appealed the judgment to the Appellate Division, arguing, inter alia, that the prosecutor's references to his post-arrest, post-*Miranda* silence violated his constitutional right to due process under *Doyle v. Ohio*, 426 U.S. 610 (1976). The Appellate Division agreed that the references constituted a due process violation, but found this error to be harmless and affirmed the judgment. *See Davis v. Gov't of V.I.*, No. 2002-085, 2007 WL 1574402, at *3-7 (D.V.I. Apr. 3, 2007).

Davis timely appealed the Appellate Division's order to this Court. We have jurisdiction under 48 U.S.C. § 1613a(c). *See Gov't of V.I. v. Hodge*, 359 F.3d 312, 317 (3d Cir. 2004).

9

We will exercise plenary review over the constitutional question presented in this appeal. *See Tyler v. Armstrong*, 365 F.3d 204, 208 (3d Cir. 2004) ("In reviewing the Appellate Division's orders, this Court 'should review the trial court's determination using the same standard of review applied by the first appellate tribunal.'" (quoting *Semper v. Santos*, 845 F.2d 1233, 1235 (3d Cir. 1988))); *United States v. Barnhart*, 980 F.2d 219, 222 (3d Cir. 1992) ("Our standard of review for [a defendant's] due process claim is plenary.").

II.

Davis argues on appeal that although the Appellate Division correctly concluded that the prosecutor's references to his post-arrest, post-*Miranda* silence violated his right to due process under *Doyle*, this constitutional violation amounts to reversible error. The Government responds by arguing that the prosecutor's references were constitutionally permissible and, even were they impermissible, the error would be harmless given the evidence presented against Davis. Having reviewed the record, we conclude that the prosecutor's references violated Davis's right to due process and that the violation in this case cannot be considered harmless beyond a reasonable doubt.

A.

We begin with the facts of *Doyle*. In that case, two criminal defendants who had received *Miranda* warnings testified at trial that they had been framed by another individual and, on cross-examination, the prosecutor questioned them about whether they had told their exculpatory story to the police

10

when they were arrested. After the trial court overruled defense counsel's objections to this line of questioning, the defendants answered that they had not done so.

On certiorari to the Supreme Court, the government argued that such questioning was a proper means of impeaching the defendants' exculpatory testimony. The Court rejected this argument, holding that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle*, 426 U.S. at 619. The Court explained that the *Miranda* warnings are "a prophylactic means of safeguarding Fifth Amendment rights" and that "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights." *Id.* at 617. Further, the Court stated that although "the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Id.* at 618. Therefore, it is "fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.*[3]

---

[3]Although decided under the Fourteenth Amendment, *Doyle* applies to federal prosecutions under the Fifth Amendment as well. *United States v. Agee*, 597 F.2d 350, 354 n.11 (3d Cir. 1979) (en banc). The Virgin Islands' Revised Organic Act of 1954 makes clear that the protections of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment extend to the Virgin Islands. 48 U.S.C. § 1561;

11

In the Court's post-*Doyle* jurisprudence, it has emphasized that the due process violation stems from the government's breach of its implicit assurance that the defendant's "silence will carry no penalty." *Wainwright v. Greenfield*, 474 U.S. 284, 290-91 (1986). Thus, in defining some of the boundaries of what due process permits, the Court has held that *Doyle* is not violated where the prosecutor impeaches a defendant with his pre-arrest silence, *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980), uses a defendant's voluntary statements to the police following *Miranda* warnings, *Anderson v. Charles*, 447 U.S. 404, 408 (1980), or uses a defendant's post-arrest silence before *Miranda* warnings have been given, *Fletcher v. Weir*, 455 U.S. 603, 605-07 (1982). In addition, there may be no *Doyle* violation where the trial court sustains an objection to the improper question and provides a curative instruction to the jury, thereby barring the prosecutor from using the silence for impeachment. *Greer v. Miller*, 483 U.S. 756, 764-65 (1987).

Turning to the matter before us, we agree with the Appellate Division that the prosecutor's references to Davis's silence violated his right to due process. The record shows that the prosecutor attempted "to elicit the precise inferences that the [Government] is prohibited from exploiting under *Doyle*." *Hassine v. Zimmerman*, 160 F.3d 941, 948 (3d Cir. 1998). As described above, Davis received *Miranda* warnings and at no

_____

*accord Hendrickson v. Reg O Co.*, 657 F.2d 9, 13 n.2 (3d Cir. 1981) ("[T]he Organic Act requires the same due process analysis that would be utilized under the federal constitution.").

12

point did he provide a statement to the police.[4] During trial, the prosecutor sought to impeach Davis's credibility by highlighting the fact that he had not advanced his exculpatory version of the shooting to the police from the time he was arrested to the time of trial. And the Territorial Court took no action to cure this constitutional error, overruling defense counsel's objections.

We find the Government's reliance on *Raffel v. United States*, 271 U.S. 494 (1926), to be misplaced. In *Raffel*, a case decided decades before both *Miranda* and *Doyle*, the Supreme Court concluded that Fifth Amendment "immunity from giving testimony is one which the defendant may waive by offering himself as a witness" and, consequently, "[h]e may be examined for the purpose of impeaching his credibility." *Id.* at 496-97. The Government, in characterizing *Doyle* as an exception to *Raffel*, argues that *Doyle* only limits a prosecutor from referencing at trial a defendant's post-*Miranda* silence at the

---

[4]Even though the Government did not attempt to meet its burden of establishing that Davis did not receive *Miranda* warnings prior to using his post-arrest silence for impeachment, defense counsel during redirect examination established for the record that Davis received the warnings upon his arrest. *See United States v. Cummiskey*, 728 F.2d 200, 202, 206 (3d Cir. 1984) (indicating "[a]t no time during trial did the government or either defendant establish the time at which the defendants had been given the warning prescribed by *Miranda*" and remanding for a post-trial hearing on whether warnings had been issued); *see also* Appellee's Br. at 24 (acknowledging that the prosecutor asked Davis "about his post-*Miranda* silence").

13

time of his arrest, and that *Raffel* thus permits impeachment at trial on the defendant's silence during any other time prior to trial.[5] However, in addition to the obvious distinction that *Raffel* speaks only to the privilege against self-incrimination rather than due process, the Government's position on this point fails to account for our decision in *Hassine*, where we found a *Doyle* violation based on prosecutorial questioning of a defendant about his silence during the months of his incarceration period up until trial, and which controls our decision here. *Hassine*, 160 F.3d at 947-49 (exercising plenary review over whether the prosecutor violated *Doyle*, noting that the case was not subject to the Antiterrorism and Effective Death Penalty Act of 1996); *cf. United States v. Balter*, 91 F.3d 427, 439 (3d Cir. 1996) ("A defendant might well remain silent for such a period in reliance on the belief, engendered by the warnings, that his silence could not in any way be used against him.").[6] Accordingly, we

---

[5]The Government hinges its argument on a footnote in *Doyle*, in which the Court found it "unnecessary" to determine the constitutionality of prosecutorial inquiry into silence beyond the initial arrest time frame. 426 U.S. at 616 n.6.

[6]And, in any event, the Government does not dispute that the prosecutor focused on Davis's silence at the time of his arrest, bringing those references within even its narrow conception of *Doyle*. Appellee's Br. at 24 ("The prosecutor asked the defendant about his post-*Miranda* silence at the time of arrest, and the defendant responded. The prosecutor in closing and rebuttal did point out that the defendant didn't speak at his arrest.").

14

conclude that the prosecutor's comments regarding Davis's post-arrest, post-*Miranda* silence violated *Doyle* and reject the Government's argument to the contrary.

B.

Having found a due process violation, we examine whether this constitutional trial error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."); *see also Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (characterizing a *Doyle* violation as a "trial error" subject to harmless error inquiry (citing *Arizona v. Fulminante*, 499 U.S. 279, 307 (1991))). In making this determination, the Government must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24; *accord United States v. Korey*, 472 F.3d 89, 96 (3d Cir. 2007). The question "'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'" *Korey*, 472 F.3d at 96 (quoting *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis omitted)). We have previously determined that *Doyle* error may be held harmless beyond a reasonable doubt in cases where there is overwhelming evidence against the defendant. *See Balter*, 91 F.3d at 440; *United States v. Dunbar*, 767 F.2d 72, 76 (3d Cir. 1985); *cf. Harrington v. California*, 395 U.S. 250, 254 (1969) (concluding that because "the case against [the

15

defendant] was so overwhelming" the error "was harmless beyond a reasonable doubt").

The Appellate Division concluded that the testimony of Francis, Petrus, and Parrilla was "significant evidence from which the jury could have found guilt" and therefore the error "could not have affected the outcome of the trial." *Davis*, 2007 WL 1574402, at *7. As an initial matter, we are unsatisfied with this conclusion insofar as the Appellate Division focused on whether the evidence was sufficient to convict despite the error, as opposed to whether there was a reasonable possibility that the error contributed to the jury verdict. *See Satterwhite v. Texas*, 486 U.S. 249, 258-59 (1988) ("The question, however, is not whether the legally admitted evidence was sufficient . . . but rather, whether the [Government] has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" (quoting *Chapman*, 386 U.S. at 24)).

But more importantly, we are unable to conclude that the Government presented overwhelming evidence against Davis. As the Appellate Division indicated, it was undisputed that someone shot at Francis's vehicle from the truck in which Davis was riding. The physical evidence presented at trial, which included one of the bullets and Francis's truck, certainly supported that someone had shot at the vehicle, but favored neither side's specific account of the incident or the identity of the shooter. Consequently, the Government's case against Davis depended largely upon the credibility of its three eyewitnesses.

Although Francis, Petrus, and Parrilla provided similar accounts of the shooting, the three witnesses also indicated that

16

they had close associations – Francis and Parrilla were romantically involved and had a child, and Francis and Petrus were neighbors and friends – and the testimony of each suggested, to varying degrees, a prior antagonistic relationship with Davis. Additionally, Francis and Petrus gave inconsistent testimony about what happened on the morning of the shooting; Francis testified that Petrus was with him at a local store that morning (where they appeared to have some sort of altercation with Davis and his brother), but Petrus indicated that he was not there. Further, despite their prior statements to the police indicating that about four shots had been fired, Francis and Petrus testified during trial that Davis fired three shots. Finally, the witnesses acknowledged that they delayed reporting the shooting to the police until a day after the incident.

Compared to the instances in which we have considered *Doyle* error harmless based on overwhelming evidence against a defendant, the Government's case against Davis falls short of the mark. For example, in *Balter*, we concluded that any *Doyle* violation was harmless because the government presented ample evidence that the defendant agreed to and took part in a plan to murder another individual; indeed, the defendant's co-conspirator in that case provided comprehensive testimony about "every aspect of [the defendant's] involvement," which was largely corroborated by taped conversations between the defendant and other co-conspirators. 91 F.3d at 440. And in *Dunbar*, we determined that the evidence was overwhelming where two bank tellers identified the defendant from a photographic display after a surveillance camera captured pictures of the defendant robbing a bank, and one of the defendant's friends testified that the defendant had confessed to

17

robbing the bank and had shown him the stolen money. 767 F.2d at 73. Here, in contrast, our review of the record leaves us unconvinced that the evidence against Davis was so overwhelming that the jury's verdict "was surely unattributable to the error." *Korey*, 472 F.3d at 97 (internal quotation marks omitted).

Moreover, the severity of the *Doyle* violation weighs in favor of reversal. In this case, because of the conflicting versions of the shooting, the credibility of the witnesses was crucial to the jury's verdict. Consequently, the prosecutor's impermissible comments about Davis's failure to provide his exculpatory version of the shooting to the police went to the core of his theory of defense and, as a result, his credibility. *See United States v. Cummiskey*, 728 F.2d 200, 204 (3d Cir. 1984) (finding that *Doyle* error could not be held harmless where "the issue of whether [the defendant] had in fact related a similar story to police when he was arrested was crucial to the theory of the defense" and the prosecutor's statements about the defendant's silence during cross-examination and closing argument "attacked the heart of [the defendant's] case" (internal quotation marks omitted)). Nor was this an instance of an isolated or ambiguous reference to a defendant's silence. *See United States v. Curtis*, 644 F.2d 263, 270-71 (3d Cir. 1981) (finding that where the trial court allowed cross-examination on post-arrest silence and the prosecutor later referenced the silence during closing argument, the references were "neither isolated nor ambiguous" and the "errors, cumulative in effect," were not harmless). The prosecutor repeatedly highlighted to the jury that Davis failed to offer his explanation to the police, directly undermining the plausibility of his defense. *See United States*

18

*v. Agee*, 597 F.2d 350, 359 (3d Cir. 1979) (en banc) (stating that even assuming *Doyle* error, it was harmless because this case was not one "in which repetitive questioning focused the jury's attention on the defendant's silence," the "question was ambiguous," and the "question did not directly link [the defendant's] purported silence with his exculpatory testimony"); *cf. Marshall v. Hendricks*, 307 F.3d 36, 76 (3d Cir. 2002) (analyzing for harmlessness and stating that the attack against the defendant was "indirect," unlike in *Doyle* where "the prosecutor attacked the defendant directly").

Further, the absence of a curative instruction by the Territorial Court likely left the jury with the false impression that the prosecutor's references to Davis's silence, including any adverse credibility inferences to be drawn from such silence, were appropriate. *Cf. Dunbar*, 767 F.2d at 76 (stating that, even assuming *Doyle* was violated, the error was harmless, noting that there was overwhelming evidence against the defendant and the trial court "gave an adequate curative instruction"). We disagree with the Government's assertion that the Territorial Court's "presumption of innocence" jury instruction sufficiently cured the *Doyle* error. To the contrary, the Territorial Court likely compounded the unchecked due process violation here by instructing the jury that, when weighing the credibility of a witness, it should determine whether the witness's testimony was contradicted by what that witness had said or done at another time. *Cf. Gov't of V.I. v. Mujahid*, 990 F.2d 111, 117 (3d Cir. 1993) (finding that the trial court's failure to give a curative instruction compounded the prejudice caused by the error).

19

The Government relies on our decision in *Hassine* in arguing that the *Doyle* violation was harmless in this case. But the harmless error analysis in that case is of limited value here because it involved an appeal from the denial of habeas corpus relief, which generally triggers a different, less demanding legal standard than *Chapman* for assessing harmless error. *See Brecht*, 507 U.S. at 622-23, 637-38 (holding that the "substantial and injurious effect or influence" standard, as opposed to the "harmless beyond a reasonable doubt" standard, "applies in determining whether habeas relief must be granted because of constitutional error of the trial type" (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))); *see also O'Neal v. McAninch*, 513 U.S. 432, 438 (1995) (stating that "the more lenient *Kotteakos* harmless-error standard, rather than the stricter *Chapman* standard, normally governs cases of habeas review of constitutional trial errors"). Indeed, we explicitly noted in *Hassine* that, in applying the less onerous habeas harmless error standard, we did not reach the issue of whether the error would pass muster under *Chapman*. 160 F.3d at 952, 955 n.14.

In addition, the prosecution in *Hassine* introduced significantly more evidence against the defendant than the Government presented here, including the testimony of thirty-four witnesses, many of whom testified consistently about the defendant's plan to commit murder. The prosecution in that case also presented a considerable amount of evidence regarding the defendant's suspicious conduct during and after the time of the incident, and the defendant's own testimony was largely undermined by the weight of the evidence against him. Further, in regard to the *Doyle* violation in *Hassine*, the trial court

sustained all three objections to the prosecutor's improper questioning, which prevented the defendant from answering the questions. This stands in stark contrast to the circumstances here, where the Territorial Court overruled defense counsel's objections and allowed the prosecutor to unfairly utilize Davis's answers to the *Doyle*-violative questioning to attack his credibility before the jury.

Accordingly, considering the lack of overwhelming evidence in this case along with the prosecutor's repetitive references to Davis's post-arrest, post-*Miranda* silence directed at the theory of his defense, we cannot say beyond a reasonable doubt that this violation of *Doyle* did not contribute to the jury's verdict.

### III.

Although we conclude that a reversal is necessary, we believe it prudent to address Davis's challenge to the Territorial Court's jury instruction regarding transferred intent, given the likelihood of this issue's reoccurrence at a new trial. Over Davis's objection, the Territorial Court included the following instruction in its charge to the jury:

> If you find that the defendant assaulted Shawn Francis with the intent to murder him and by mistake or accident assaulted Sean Petrus, Erica Parrilla an[d] Shanadalis Francis, the element of intent is satisfied even though the defendant did not assault, with the intent to murder Sean Petrus, Erica Parrilla and Shanadalis Francis. The law

21

transfers the intent from the original victim to any unintended victims.

On appeal, Davis argues that the doctrine of transferred intent does not apply to first-degree assault as defined under Virgin Islands statutory law. Exercising plenary review over this challenge to the legal propriety of the instruction, we agree. *United States v. Zehrbach*, 47 F.3d 1252, 1260 (3d Cir. 1995) (en banc).

The information charged Davis, inter alia, with four counts of first-degree assault in violation of subsection (1) of section 295, which states: "Whoever . . . with intent to commit murder, assaults another . . . shall be imprisoned not more than 15 years." V.I. Code Ann. tit. 14, § 295(1). While we have not previously had occasion to decide whether the transferred intent doctrine applies to subsection (1) of section 295, our precedent interpreting the similar subsection (3)[7] is instructive in this regard. *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

We interpreted subsection (3) of section 295 in *Government of Virgin Islands v. Greenidge*, 600 F.2d 437 (3d Cir. 1979). In that case, the defendant was convicted of

---

[7]Subsection (3) of section 295 states: "Whoever . . . with intent to commit rape, sodomy, mayhem, robbery or larceny, assaults another . . . shall be imprisoned not more than 15 years." V.I. Code Ann. tit. 14, § 295(3).

assaulting an individual with the intent to commit rape. The evidence, however, demonstrated that the man whom the defendant assaulted was not the same person the defendant intended to rape – the defendant pointed a gun at the man, grabbed a woman with whom the man was walking, and subsequently raped her – and we reversed the conviction, finding that "a necessary element of the crime of assault with intent to commit rape is that the assault have been committed on the same person whom the defendant intended to rape." *Id.* at 439-40. We reaffirmed this interpretation of subsection (3) in *Government of Virgin Islands v. Brown*, 685 F.2d 834 (3d Cir. 1982), in which the defendant was charged with several counts of assault with the intent to commit robbery. Although the trial court in that case instructed the jury that the prosecution was required to prove that the defendant "had the specific intent to commit robbery," we concluded that the instruction misstated the law, explaining that the defendant's multiple convictions for first-degree assault could "be sustained only if the evidence showed beyond a reasonable doubt that the defendants not only assaulted their victims but intended to commit robbery on each of them specifically." *Id.* at 841.

The only apparent distinction between subsections (1) and (3) of the first-degree assault statute is the nature of the underlying selection of crimes which the defendant must have the specific intent to commit during the perpetration of the assault; both provisions state that the specific intent to commit an underlying crime be directed against the individual assaulted. *Cf. United States v. Lanier*, 520 U.S. 259, 266 (1997) ("[T]he canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal

23

statute as to apply it only to conduct clearly covered."). Thus, in light of our interpretation of subsection (3), we consider it appropriate to extend the teachings of *Greenidge* and *Brown* to subsection (1) of section 295. *Cf. United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008) (stating that "statutes dealing with similar subjects should be interpreted harmoniously" (internal quotation marks omitted)); *Bundens v. J.E. Brenneman Co.*, 46 F.3d 292, 305 n.28 (3d Cir. 1995) ("[N]o one subsection of a statute should be read in isolation."). The transferred intent instruction here relieved the Government of its burden of proving beyond a reasonable doubt that Davis had the specific intent to commit murder against each individual on whom the assault was committed. *See Brown*, 685 F.2d at 841 ("The jury should have been instructed that in addition to the other essential elements, the government had to prove beyond a reasonable doubt that the defendants intended to rob the particular victim on whom the assault was perpetrated."). As a result, we agree with Davis that it was error to give the transferred intent instruction. Because we have already determined that the *Doyle* violation is reversible error, however, we need not decide whether this error constitutes a separate ground for reversal.[8]

[8]Davis raises one additional issue on appeal, arguing that the trial court committed reversible error in striking one of the venire members during voir dire. However, unlike the question involving the transferred intent instruction, which may reemerge during a new trial, we see no reason to address this issue.

24

IV.

For the foregoing reasons, we will reverse the order of the Appellate Division, vacate the judgment of conviction, and remand for further proceedings, including a new trial.