PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2389
_____

UNITED STATES OF AMERICA

v.

GATHON DUDLEY SHANNON,
                                        Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-11-cr-00237-003)
District Judge:  Honorable Alan N. Bloch
_____

Argued on July 8, 2014

Before: RENDELL, CHAGARES, and JORDAN, *Circuit
Judges*

(Filed: September 8, 2014)
_____

Paul D. Boas, Esq.   [ARGUED]
429 Fourth Avenue
Law and Finance Building
Suite 500
Pittsburgh, PA 15219
        *Counsel for Appellant*

Donovan J. Cocas, Esq.   [ARGUED]
Rebecca R. Haywood, Esq.
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
        *Counsel for Appellee*

_____

OPINION

_____

JORDAN, *Circuit Judge*.

Gathon Dudley Shannon appeals his conviction and the sentence imposed on him by the United States District Court for the Western District of Pennsylvania.  Among other things, he contends that the government violated his Fifth Amendment rights at trial by cross-examining him about his post-arrest silence.[1]  Because we agree that the government

_____

[1] By "post-arrest" silence, we mean Shannon's silence following his arrest and receipt of the attendant warnings under *Miranda v. Arizona* of his right to remain silent.  384 U.S. 436, 467-68  (1966).  Shannon also argues that the District Court abused its discretion by admitting into evidence

violated his constitutional right to remain silent, we must vacate the judgment of conviction and remand for a new trial.

## I. BACKGROUND

Whether Shannon's conviction can stand is contingent on whether the constitutional error that infected his cross-examination was "harmless beyond a reasonable doubt."[2] *Chapman v. California*, 386 U.S. 18, 24 (1967). We therefore provide a detailed overview of the evidence presented at trial.

### A. *Factual History*

In December 2009, the Pennsylvania State Police ("PSP") along with the United States Drug Enforcement Administration ("DEA") began investigating an increase in

---

his two prior convictions despite their being more than twenty years old; that it erred in issuing certain supplemental jury instructions after the jury had indicated that it was deadlocked; and that it violated his Sixth Amendment rights by basing his sentence on a judicial finding of fact – which implicated a specific statutory maximum and minimum sentence – rather than on the jury's verdict. We mention these issues later, *see infra* at n.9, but do not decide them because the Fifth Amendment violations apparent on the record require reversal.

[2] As explained within, the government must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," to sustain the conviction. *Chapman v. California*, 386 U.S. 18, 24 (1967).

cocaine sales across Beaver County, Pennsylvania. Working with confidential informants, the DEA was able to identify the local distributor as Adrian Taylor, and, through a series of wiretaps, learned that a large shipment of cocaine was expected to arrive in Beaver County during the weekend of August 20-21, 2011.

Using traditional surveillance techniques, the DEA watched Taylor leave his Beaver Falls home on August 20 to collect money from his street-level dealers in anticipation of the shipment's arrival. According to Taylor – who ended up testifying on behalf of the government – he then drove to a hotel near the Pittsburgh International Airport carrying two bags, one full of cash that he had collected from his associates and the other containing items necessary to "wrap" the cash.[3] There, he met with the cocaine supplier, Vincent Middlebrooks from Houston, Texas, who counted the cash and wrapped it while Taylor waited. Taylor testified that, during drug deals like this, he "always only [met with] Middlebrooks." (App. at 984.) According to Taylor, after the cash was prepared, Middlebrooks drove to Washington County, Pennsylvania, where he was expected to "grab[] the coke" and then come back and transfer the drugs to Taylor. (*Id*. at 985.)

Shortly after midnight the following day, when the exchange of drugs for cash was evidently complete, a DEA team saw Taylor flag down Middlebrooks at a second hotel. The two conversed briefly, and Taylor left and drove home. The agents then observed Middlebrooks go back to the first

---

[3] "Wrapping" the cash means shrink-wrapping it in preparation for exchanging the cash for drugs.

4

hotel. The next morning, agents saw Middlebrooks return his rental car at the Pittsburgh airport and embark on a flight back to Houston.

Given that Taylor had succeeded in bringing multiple kilograms of cocaine into Beaver County, the DEA was able to persuade a judge that a "roving wiretap" on Taylor's communications was warranted to follow the drugs and money and to learn more information about Middlebrooks.[4] In the meantime, by early September, Taylor's Beaver County associates had already sold all the cocaine from the August shipment and were, as the government says, "clamoring for more." (Gov't's Br. at 6.) Taylor thus immediately began preparing for the next deal, collecting as much cash as he could to bankroll another shipment.

On September 27, 2011, Taylor texted Middlebrooks, asking when the next cocaine shipment was expected to arrive in Beaver County. That was the first communication between the two that the government had intercepted. The two then spoke by telephone, with Middlebrooks confirming that the next shipment would arrive within two days, on Thursday, September 29, 2011. During that telephone call, in which Taylor agreed to buy 16 kilograms of cocaine, Middlebrooks confirmed that he would fly to Cleveland, Ohio, on September 28 and proceed to drive to a hotel near Taylor's house, where he would spend the night packaging the cash for the following day's deal.

---

[4] A regular wiretap involves tapping a particular phone whereas a roving wiretap authorizes the government to, in effect, tap a person, "intercept[ing] any and all identified telephones used by that person." (App. at 284.)

On the night of September 28, 2011, DEA agents in Cleveland spotted Middlebrooks as he deplaned from a flight inbound from Houston, walking with a black roller-bag. The agents followed Middlebrooks as he drove a rental car two hours from the Cleveland airport to one of the Pittsburgh hotels where he had previously met Taylor. While en route, Middlebrooks spoke with Taylor on the phone and stated that he "got the car and everything." (App. at 624.) Taylor responded by warning Middlebrooks to "keep your eye out." (*Id*. at 625.)

In the early morning hours of September 29, 2011, DEA agents watched as Taylor arrived at the hotel – again, carrying two bags – and joined Middlebrooks. After approximately ten minutes together, Taylor walked out without the two bags and returned to his vehicle. Several hours later, Middlebrooks called Taylor and told him that he was "on the move." (*Id*. at 669.) Having wrapped the money into nine packets, Middlebrooks left the hotel with a single bag containing the cash. As he proceeded to drive to a truck stop in Eighty Four, Pennsylvania, in Washington County – the same county where the August 20-21 cocaine transaction had occurred – several DEA agents surreptitiously followed him.[5]

According to the government, once Middlebrooks reached the truck stop, the agents were forced to "hang back and watch from a distance so as not to blow their cover."

---

[5] Eighty Four is a town in Washington County, Pennsylvania, and, by Shannon's testimony, is also the name of the local truck stop.

(Gov't's Br. at 8.) From their vantage point, they saw Middlebrooks back his vehicle up to a tractor-trailer rig, open his trunk, and then hand the bag full of packaged cash to a man – later identified as Shannon – standing beside the rig. Notably, the agents said that they did not see Middlebrooks receive anything in return because their view was partially obstructed by a building and various parked trucks. The next thing the agents observed was Middlebrooks getting back into his car. The agents followed him as he rendezvoused with Taylor at the same hotel from which he had come. At that point, given that the money had already changed hands, the officers moved in to arrest both men. When Taylor and Middlebrooks were taken into custody, each was found with three different cell phones on their persons, including a Boost Mobile Phone on Middlebrooks. "[A] black bag containing a large amount of cocaine" was also found in the trunk of Middlebrooks's car. (App. at 801.)

Back at the truck stop, Shannon stored the bag inside the cab of his truck and remained waiting inside the rig. According to testimony Shannon later gave on the witness stand, he had traveled to Eighty Four, a truck stop he often frequented, only as a favor to someone named Phillip Williams, a trucker whom he became acquainted with while on the road and whom he had occasionally met in Houston. Shannon said that Williams had called him to ask whether, as a favor, he would pick up someone named "Vince," another trucker, whose vehicle had supposedly broken down in Pittsburgh. Shannon testified that he did not know Vince but was willing to oblige Williams's request because he himself had recently been stranded after his own truck broke down and he empathized with Vince's predicament. According to Shannon, he had agreed to meet Vince at Eighty Four – not

7

exactly where Williams had requested, but a familiar haunt to Shannon – to give Vince a ride back to Houston.

But upon meeting "Vince," who turned out to be Middlebrooks, Shannon claimed to be puzzled. Not only did Middlebrooks arrive driving a car, which implied that he was in no need of a ride, but he also handed Shannon a bag and asked whether he would be willing to wait "about an hour" so that he could "take care of some other business." (App. at 1356.) Shannon testified that he agreed to wait because he had already gone out of his way to pick the man up. After some "[t]ime went by," however, Shannon said he became concerned by the situation and opened the bag, worried that he might have been handed "dope." (*Id*. at 1357-59.) Shannon testified that, when he saw that it was instead cash, he "put the money back in the bag[,] ... threw it up under [his] bed and got out of [his] truck." (*Id*. at 1359.) According to Shannon, he began walking towards the truck stop's store to call his girlfriend for help. He was arrested before he reached the building.

Upon a search of Shannon's vehicle and person, agents found the bag, which contained $669,340, as well as $1000 in the glove compartment of the truck and three phones – a Boost Mobile phone on the truck's dashboard, an iPhone on the ground near where Shannon was arrested, and a Verizon Motorola phone.

On December 14, 2011, a grand jury in the Western District of Pennsylvania handed down a superseding indictment that, *inter alia*, charged Shannon, Taylor, and Middlebrooks with Conspiracy to Distribute and Possess with Intent to Distribute Five Kilograms or More of Cocaine, in

8

violation of 21 U.S.C. § 846 (Count I), and Distribution and Possession with Intent to Distribute Five or More Grams of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii) (Count II). Both Middlebrooks and Taylor pleaded guilty, but Shannon chose to go to trial.

B. *The Trial*

Shannon's trial strategy was to emphasize that he was trying to do someone a favor and that he was simply caught in the wrong place at the wrong time. The government, on the other hand, endeavored to prove that he had been a drug courier for Middlebrooks since at least late 2009. To that end, the government placed particular focus on the circumstances surrounding Shannon's arrest and its aftermath.

For example, Taylor testified that, when he and Shannon were together in pre-trial detention, Shannon confessed he had been skimming cash from the proceeds of drug deals for some time in order to cover "gas money." (App. at 1007.) The government argued that such skimming would explain the $1000 found in the truck's glove compartment when Shannon was arrested. Shannon, of course, denies that interpretation and maintains that he only kept cash in the glove compartment in case of an emergency, ever since the trouble he encountered when his truck broke down.

Like Taylor and Middlebrooks, Shannon was also arrested with three different cell phones on or near his person. The government presented testimony that "people who are involved in drug trafficking" often have multiple phones, including prepaid cell phones like Shannon's Boost Mobile

9

phone, and "everyday" phones like Shannon's iPhone. (App. at 234, 243.) The government also confirmed through telephone records that Shannon and Middlebrooks each used their respective Boost Mobile phones to contact only one other such phone, *i.e.*, a companion phone. In fact, the government brought to light that, on multiple occasions, including during the August 20-21 and September 29 drug deals, signals from Shannon's and Middlebrooks's Boost Mobile phones were relayed by a cell tower in Eighty Four when the phones were used to "chirp"[6] their companions.

Shannon tried to explain to the jury why he needed three phones. He said that the Verizon Motorola phone was his "everyday" phone and was registered under his name, while the iPhone was used solely for "jobs purposes" and was registered under his former girlfriend's name because she had better credit than he did at the time it was purchased. (App. at 1404-06.) As for the third phone, the Boost Mobile phone, Shannon claimed that it was purchased in May 2011 as a specially dedicated phone for speaking to his nephew Jeremy, whom Shannon said he considered as a son. According to Shannon, he bought two Boost Mobile phones in 2011, one for him and one for Jeremy, because Boost Mobile offered a pre-paid, month-to-month plan with unlimited minutes and "chirp" features, and he wanted Jeremy to learn how to "handle a phone" and the responsibility of paying for a phone before he switched Jeremy to his Verizon Wireless account. (App. at 1408.) Although Shannon admitted that he intentionally registered the Boost Mobile phones under a

---

[6] "Chirps is the walkie-talkie feature of the Boost Mobile phone." (App. at 1230.)

pseudonym, he said he did so only because he was told that, as pre-paid phones, they could be registered under any name.

Finally, the government confirmed during Shannon's cross-examination that his logbooks – which, as a long-haul trucker, he was required to keep by his employer and the United States Department of Transportation – were often falsified. From the government's perspective, Shannon's decision to make "wrong entries" in the logbooks was proof that he was not making some side-trip to Eighty Four on the day of his arrest but was in fact regularly traveling there, as also evidenced by his Boost Mobile phone making use of a local cell tower nearly every time Middlebrooks flew into the Pittsburgh area. (App. at 1452.) Again, Shannon had an explanation for the falsified log entries. He admitted that he sometimes lied in his logbook but only to cover up his driving to Baltimore to visit his paramour, Mary Simpson. When asked by the government whether he lied in the logbook because he could not "put all that driving time down" and still do his "real job," Shannon agreed. (*Id.*)

After Shannon testified about his secret lover Simpson, his favor-seeking trucker friend Williams, and his beloved nephew Jeremy – all in an effort to explain some of the more damning circumstances surrounding his arrest – the government took the step that has become the main point of contention in this case: it asked him why he had not come forward earlier with his exculpatory version of the facts. Shannon's counsel immediately objected to the government's questions, citing the Fifth Amendment, but he was summarily overruled. Shannon was therefore pressed to explain his silence. He did so by saying that he had told his lawyer his version of the events in question.

11

Following closing arguments, and after several hours of deliberating, the jury came back and announced it was deadlocked. In response, the District Court gave the jury an *Allen* charge,[7] which it claimed was "almost exactly," if not "word-for-word," the model jury instruction provided in our Circuit. (App. at 1645.) Shortly thereafter, the jury returned and found Shannon guilty on Count I (conspiracy) but not guilty on Count II (possession). Notably, the jury found that the government had only proven beyond a reasonable doubt that Shannon was responsible for less than 500 grams of cocaine, and so indicated on the verdict slip, which provided the option of finding him responsible for more than 5 kilograms (as alleged in the indictment), more than 500 grams, or less than 500 grams. The District Court disagreed, however, saying that "there [was] absolutely no evidentiary basis to support [the jury's] finding" of less than 500 grams. (App. at 1744.) It therefore held him accountable for 16 kilograms of cocaine and sentenced him to 240 months' imprisonment as well as six years of supervised release.

Shannon timely appealed.

## II. DISCUSSION[8]

---

[7] *See Allen v. United States*, 164 U.S. 492, 497 (1896) (approving a supplemental instruction given to encourage a deadlocked jury to resolve its differences and reach a verdict).

[8] The District Court had jurisdiction over this matter under 18 U.S.C. § 3231. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

While Shannon raises several issues on appeal, we focus on his Fifth Amendment argument because the government's questioning of Shannon about his post-arrest silence is alone enough to require that the conviction be set aside.[9]

---

[9] The parties contest whether the District Court violated Shannon's Sixth Amendment rights at sentencing and, in that regard, have raised arguments regarding the applicability of *Alleyne v. United States*, 133 S. Ct. 2151 (2013) (holding that any fact implicating a statutory maximum or mandatory minimum sentence is an element of an offense that must be found by a jury beyond a reasonable doubt). We decline to address those and other arguments raised by Shannon, since we must vacate his conviction. Although we refrain from deciding those remaining arguments, we would be remiss if we did not make the following observations.

First, in light of the Court's finding that Shannon's two prior convictions, both more than twenty years old, could be admitted under Rules 404(b) and 609(b) of the Federal Rules of Evidence, it is worth noting the narrow purpose and specific contours of each rule. Rule 609, which governs the use of convictions as evidence of truthfulness for impeachment purposes, limits the admission of a conviction more than 10 years old unless "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect." Fed. R. Evid. 609(b)(1). The Advisory Committee Notes for Rule 609(b) emphasize that "convictions over 10 years old will be admitted *very rarely* and *only in exceptional circumstances*." Fed. R. Evid. 609(b) advisory committee's note (emphasis added). Similarly, while Rule 404(b) allows evidence of earlier convictions to be

admitted as impeachment evidence "for another purpose" besides showing predisposition to commit the crime – such as proving "absence of mistake" or "lack of accident" – we have held that:

> prior act evidence [under Rule 404(b)] is inadmissible unless the evidence is (1) offered for a proper non-propensity purpose that is at issue in the case; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 such that its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested.

*United States v. Caldwell*, No. 13-1918, -- F.3d -- , 2014 WL 3674684, at *7 (3d Cir. July 24, 2014). Furthermore, we have emphasized that the non-propensity "purpose" for which 404(b) evidence is admitted must be narrowly construed and explicitly recorded by the Court. *See, e.g.*, *United States v. Davis*, 726 F.3d 434, 443 (3d Cir. 2013) (noting that prior experience with small amounts of a drug would not have provided the requisite knowledge under Rule 404(b) to help a defendant identify a large amount of that drug since "[t]he packaging or quantity might be different, and objects in greater quantities often have an appearance or smell of their own"); *United States v. Givan*, 320 F.3d 452, 466 (3d Cir. 2003) (McKee, J., concurring in part and dissenting in part) (noting that the exception for "absence of mistake" under Rule 404(b) requires the government to demonstrate the defendant's same "modus operandi" in a prior crime). A court should hesitate to admit twenty-year-old convictions when that evidence looks like propensity evidence. Under

14

The guarantee that "[n]o person ... shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, is so "fundamental to our system" of government that, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, the Supreme Court established the now-famous rule that a defendant must be informed upon arrest that he has the right to remain silent. *Miranda*, 384 U.S. at 467-68. Later, reviewing a prosecution under state law, the Court in *Doyle v. Ohio* announced that, because of the protections of

such circumstances, the evidence must ordinarily be excluded. *See United States v. Sampson*, 980 F.2d 883, 887 (3d Cir. 1992) ("Hence, where the evidence only goes to show character, or that the defendant had a propensity to commit the crime, it must be excluded.").

Second, with respect to the District Court's *Allen* charge, we reiterate that the Third Circuit Model Criminal Jury Instructions are not binding on district courts. While it may often be helpful to use the Model Instructions rather than fashioning one's own, we are not prepared to say that, simply because an instruction differs from the model, that instruction must be erroneous. If, on the other hand, an instruction "stress[es] the time, expense or burden of a new trial," the instruction would be unduly coercive and would require us to vacate a conviction and remand for rehearing. *United States v. Jackson*, 443 F.3d 293, 298 (3d Cir. 2006). The instruction at issue here did not stress any of those things, and merely mentioning that a case will have to be retried before another jury does not constitute coercion. Nonetheless, a court must be careful when highlighting the need to dispose of cases and the burden involved in calling a new jury.

the Fifth Amendment right to silence, "it would be fundamentally unfair and a deprivation of due process to allow [an] arrested person's silence to be used to impeach an explanation subsequently offered at trial." 426 U.S. 610, 618 (1976). The Court therefore held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id*. at 619. Of course, the rights secured by *Doyle* apply in equal effect "to federal prosecutions under the Fifth Amendment." *United States v. Agee*, 597 F.2d 350, 354 n.11 (3d Cir. 1979).

Reiterating the basis for the *Doyle* rule, as it has now come to be called, the Supreme Court has noted that "silence [should] carry no penalty" because the primary purpose of *Miranda* warnings is to safeguard an arrested individual's Fifth Amendment right to not speak to law enforcement authorities.[10] *Wainright v. Greenfield*, 474 U.S. 284, 290 (1986). When seeking to impeach a defendant's credibility, a prosecutor thus violates the Fifth Amendment when he highlights the defendant's post-arrest silence.[11] *Gov't of the*

---

[10] Silence is not always protected. A defendant's pre-arrest silence is not saved from a prosecutor's reaches for impeachment purposes because "no governmental action induce[s] [a] petitioner to remain silent before arrest." *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980).

[11] In *Raffel v. United States*, 271 U.S. 494 (1926), decided decades before *Miranda* and *Doyle*, the Supreme Court concluded that a defendant "may be examined for the purpose of impeaching his credibility" since the Fifth Amendment "immunity from giving testimony is one which the defendant may waive by offering himself as a witness."

16

*V.I.   v. Davis*, 561 F.3d 159, 165 (3d Cir. 2009); *Hassine v. Zimmerman*, 160 F.3d 941, 947-49 (3d Cir. 1998).

A defendant may, however, open himself up to questions about his post-arrest silence if he "testifies to an exculpatory version of events and claims to have told the police the same version upon arrest." *Hassine*, 160 F.3d at 948 (quoting *Doyle*, 426 U.S. at 619 n.11) (internal quotation marks omitted).   In that very limited circumstance, some inquiry is permitted to prevent a defendant from misleading a fact-finder about his claimed cooperation with law enforcement.   But the foundation for such an inquiry is not easy to lay.   We have explained that, to open himself up to questions about his silence, it is not enough for a defendant's later testimony to be "ambiguous" about his supposed cooperation.   *Id.* at 948 (quoting *United States v. Fairchild*, 505 F.2d 1378, 1382 (5th Cir. 1975)).   Instead, his earlier silence "must appear to be an act blatantly inconsistent with ... [his] trial testimony." *Id.* (quoting *Fairchild*, 505 F.2d at 1382) (internal quotation marks omitted).

Even when the government wrongly cross-examines a defendant about his post-arrest silence, however, that does not mean that his conviction will necessarily be infirm.   The error may still be harmless.   The operative question becomes whether the "constitutional trial error was harmless beyond a reasonable doubt."   *Davis*, 561 F.3d at 165 (citing *Chapman v. California,* 386 U.S. 18, 24 (1967)).   To sustain a

_____

*Id*. at 496-97.   In light of later precedent, however, that conclusion clearly does not apply when a prosecutor explicitly questions a defendant's post-*Miranda* silence. *Gov't of the V.I. v. Davis*, 561 F.3d 159, 165 (3d Cir. 2009).

17

conviction, the government must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24. We have previously determined that error of the sort condemned in *Doyle* "may be held harmless beyond a reasonable doubt in cases where there is overwhelming evidence against the defendant." *Davis*, 561 F.3d at 165. But it is a "decidedly heavy burden ... to demonstrate that reversal is not warranted." *United States v. Waller*, 654 F.3d 430, 438 (3d Cir. 2011).

### A.      *Objection and Preservation for Appeal*[12]

As a threshold matter, we must first determine whether, under Rule 103(a)(1)(B) of the Federal Rules of Evidence,[13] Shannon properly objected to the government's cross-examination and preserved that objection so that we can exercise plenary review, or whether we must only review the alleged *Doyle* violation for plain error. We thus turn to the record.

---

[12] We evaluate de novo a Fifth Amendment violation under *Doyle v. Ohio*, 426 U.S. 610 (1976), unless the defendant failed to object at trial. *Gov't of the V.I. v. Martinez*, 620 F.3d 321, 335 (3d Cir. 2010). In that case, we review only for plain error. *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996).

[13] Rule 103 of the Federal Rules of Evidence provides that "[a] party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party" and, if the evidence is admitted, the party objecting "states the specific ground [for the objection], unless it was apparent from the context." Fed. R. Evid. 103(a).

From a plain reading of the trial transcript, it is clear that the government asked Shannon about his post-arrest silence. When Shannon's counsel attempted to object, he was emphatically overruled:

> Q: Did you ever direct anyone to come to the authorities and say, listen, you need to know about [Williams]?
> [Defense counsel]: Your Honor, may we have a side-bar, please?
> THE COURT: No.
> [Defense counsel]: I object to that.
> THE COURT: Overruled, if that's an objection.
> [Defense counsel]: It's a comment.
> THE COURT: He's asking the question. Did you ever tell anybody about Williams.

(App. at 1474.) Upon being directed by the District Court to answer the government's question, Shannon did answer, but his counsel continued objecting and was, again, overruled:

> A: I told my lawyer about Williams.
> Q: Did you ever direct anyone to bring that information to law enforcement?
> [Defense counsel]: Your Honor, it's a Fifth Amendment comment. I object. I would like a side-bar.
> THE COURT: You're overruled.
> A: No. No.
> Q: You waited until you took the stand and then you told us about [Simpson, Williams, and Middlebrooks]; right?

19

A. Yes, sir.

[Defense counsel]: I renew my objection, Your Honor.

(*Id*.)

Defense counsel's consternation was fully justified, as the questions the government asked Shannon are patently beyond the bounds set in *Doyle*. They are indeed textbook examples of a Fifth Amendment violation.

Notwithstanding the obvious error that the government's questioning created at trial, and despite the specific and repeated objections from Shannon's attorney, the government now contends that the objections were "insufficient to alert the court of the right he was asserting because defense counsel did not even tell the court that Shannon had invoked *Miranda*." (Gov't's Br. at 22.) Repeating that line of attack at oral argument, the government claimed that the Assistant United States Attorney ("AUSA") who prosecuted the case did not understand Shannon's objection "because frankly *Doyle* wasn't mentioned, *Miranda*'s not mentioned." (Oral Arg. at 23:48-56.) The government thus asks that we adopt a bright-line rule that would require defense counsel to explicitly cite *Doyle* or its progeny when objecting to the government's questions about a defendant's post-arrest silence, as one of our sister circuits has recommended.[14]  (*See* Gov't's Br. at 22 ("In Shannon's

---

[14] The United States Court of Appeals for the First Circuit in *United States v. O'Brien* stated that objecting counsel should either "point to *Doyle* or a counterpart case or ... articulate an objection that was in substance close to the

20

case, defense counsel *never* mentioned *Doyle* in the district court. ... This was insufficient to alert the court of the right he was asserting because defense counsel did not even tell the court that Shannon had invoked *Miranda* – much less inform it that his objection had anything to do with *Miranda* – until *after* the trial was over.").) We decline that invitation.

To begin with, the government's claim that it did not understand the objection is belied by the record. Besides the fact that defense counsel explicitly stated the grounds for his objection as being based on the Fifth Amendment, the colloquy among the AUSA, defense counsel, and the District Court after the defense rested makes clear that the government understood the nature of Shannon's objection. Before closing arguments, defense counsel asked that the District Court provide "a very intense cautionary instruction on the government comment on my client's silence." (App. at 1489.) When the Court replied that Shannon "waive[d] [his] Fifth Amendment rights when [he] t[ook] the witness stand," defense counsel rightly corrected the Court and explained that taking the witness stand does not waive a defendant's right to be free of questioning about his post-arrest silence. (*Id*.) While the government now pleads

---

rationale of *Doyle*" to preserve the objection. *O'Brien*, 435 F.3d 36, 39 (1st Cir. 2006). What appears to have motivated the court in *O'Brien*, however, was the fact that defense counsel in that case gave "the *wrong* ground" for an objection. *Id*. That is not the case here. Shannon's counsel clearly objected and said, "Fifth Amendment comment." (App. at 1475.)

21

ignorance, the AUSA arguing before the District Court apparently understood that defense counsel was objecting to the inquiry into post-arrest silence. In fact, the AUSA responded by stating that "[o]nce [the defendant] gets on the witness stand and presents his side of the story, he's putting that out there and he waited a year to do that." (*Id.* at 1489-90.) Although defense counsel continued disputing the propriety of the government's inquiry into Shannon's silence, the District Court declined to give any curative or cautionary instruction.

Given that background, it beggars belief to hear the government now argue that the Fifth Amendment issue was not preserved for review. It was preserved, and the argument to the contrary actually borders on frivolous. We therefore will review the issue de novo and not, as the government requests, for plain error. *Gov't of the V.I. v. Martinez*, 620 F.3d 321, 335 (3d Cir. 2010).

### B.  *Opening the Door*

The government next argues that, even if the objection was preserved for plenary review, the AUSA's questions were appropriate and did not constitute a *Doyle* violation because Shannon "opened the door by implying he had cooperated in an investigation to find [Williams]" and because "most of the prosecutor's questions probed Shannon's *pre-arrest* failure to call police when [he] realized Middlebrooks handed him dope' or drug-money." [15] (Gov't's

---

[15] We focus our analysis on those questions the government asked Shannon during cross-examination. The government notes that the "AUSA said *nothing* about

Br. at 20-21.)  The government points to Shannon testifying that he had "tried to 'find [Williams,]" and it says he "twice implied that his efforts ... were undertaken in cooperation with authorities."  (*Id*. at 27 (citing App. at 1388, 1399).)  If Shannon had not been working with authorities, the government asks, "why else [would he be] … trying to find [Williams]?"  (Oral Arg. at 18:11-13.)  The government contends that Shannon waived his Fifth Amendment rights as explained in *Doyle* because a "defendant who wishes to protect his post-arrest silence cannot 'imply that he had participated actively in the investigation.'"  (Gov't's Br. at 28 (quoting *Hassine*, 160 F.3d at 949).)

On this point, as on the earlier question of whether the Fifth Amendment issue was preserved by appropriate objection at trial, the government's arguments strike us as badly strained.  The record simply does not reveal any "opening of the door" to allow questioning about Shannon's post-arrest silence.  Here is the exchange the government relies on:

---

Shannon's silence in his [initial] closing argument" (Gov't's Br. at 29) until Shannon's closing emphasized that the government did not "negate the legitimacy of [Shannon's] story regarding why he went to Baltimore and that his nephew, like a son for him, ... wanted to get a phone."  (App. at 1607 (Appellant Closing Statement).)  Even assuming that sequence forgave the comments at closing, it is irrelevant to the question of whether the government violated Shannon's Fifth Amendment rights under *Doyle* during its cross-examination.

23

[AUSA]: Have you looked at those phone records?

A: We looked at them. Me and my counsel went over the phone records. Keep in mind it was, what, eight, nine months had passed by. I looked at the phone records and tried, to the best of my knowledge, give the phone that I thought was [Williams's]. They took the phone, investigated it. Several phones that people call me, the numbers was dislocated. Other phone numbers that they called people would know me, but didn't know ... Williams. And when we finally got a phone number that I thought was his, it was actually a guy that works on cars, works at Meineke. Meineke Mufflers.

Q: You looked at the phone records because you know [Williams'] number has to be on that; right?

A: Yes. It has to be on there.

Q: It has to be on the Verizon phone records?

A: Yes, sir.

Q: And so, you looked at them and you can't find [Williams'] number?

A: No, sir. I can't remember his number because I didn't have it locked in.

Q: When you say you didn't have it locked in, you didn't have it saved in your contacts?

A: Didn't have it saved in my phone. Yes, sir.

(App. at 1416-17.)

There is nothing in that exchange or elsewhere in the record that can reasonably be construed as Shannon waiving his Fifth Amendment rights. Shannon did not "trumpet[] his post-arrest cooperation," as the government claims. (Gov't's Br. at 26.) On the contrary, he told the government only what he and his defense team undertook to corroborate his story. While the government asserts that Shannon's reference to "they" is a reference to the government, the transcript cannot comfortably bear that interpretation. (*Id*. at 27-28.) Shannon appears to be referring to the defense team reviewing his phone usage, not to any investigation by the government.

The government also claims that Shannon first intimated his cooperation when he prefaced an answer about Williams with the phrase "like I tell you earlier," as if "earlier" meant pre-trial and referred to working with the government. (App. at 1400.) But in that portion of his testimony Shannon was plainly not referring to pre-trial communications with the government but to a statement in Court he had made only moments earlier that he had met Williams at a restaurant in Houston.[16] It is frankly painful to watch the government's labored wresting of selected sentences from Shannon's testimony in an effort to create an impression which a straightforward reading of the record refutes. We are left to agree with Shannon that the government's arguments are nothing more than a "*post hoc* attempt to salvage an unsalvageable mistake made by the trial prosecutor." (Appellant's Reply Br. at 14.)

---

[16] Shannon testified, "I wouldn't get in touch with him. I would if, like I tell you earlier, I would see him at the place called the Boiling Crab on different occasions." (App. at 1400.)

We have searched the record in vain for evidence that Shannon's silence was "blatantly inconsistent with [his] trial testimony," as required by *Hassine* to render permissible the kinds of questions the government asked. 160 F.3d at 948-49 (citation omitted) (internal quotation marks omitted). The government argues that the "blatant inconsistency ... is that [Shannon] says he's trying to find [Williams, telling several people his version of the story], but then he doesn't convey information to those people which would enable them to help him or do anything." (Oral Arg. at 18:51-19:09.) But that argument shows that government's counsel still does not appreciate the import of *Doyle*. The government should know that Shannon does not need to "convey" information to anyone; beyond question, he has no responsibility to prove his innocence. And it should also recognize that there was nothing in Shannon's testimony that was "blatantly inconsistent" with his post-arrest silence. The government conceded as much at oral argument when it characterized as "vague" Shannon's responses regarding who he might have been working with to find Williams. (Oral Arg. at 20:01-03.) "Vague" obviously does not reach the high threshold of "blatantly inconsistent." If *Doyle* means anything, it is what is said in its very first paragraph: that it is a violation of a defendant's due process rights for a "prosecutor ... to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." *Doyle*, 426 U.S. at 611 (footnote omitted). That is precisely what happened here.

The government's second argument – that "most of the prosecutor's questions probed Shannon's *pre-arrest* failure to

26

call police" – is also a stretch of the record. (Gov't's Br. at 21.) Very few questions in that cross-examination addressed Shannon's pre-arrest failure:

> Q: When you see it's money, you panic?
> A: Yes, sir.
> Q: You don't call the police; do you?
> A: No, sir. I don't call the police.
> Q: You instead think, I'm going to get out of my car, maybe I'll call Quita?
> A: Yes, sir.

(App. at 1448.) The government's questions about post-arrest silence were also limited, consisting of the following: (1) "Did you ever direct anyone to come to the authorities and say, listen, you need to know about ... Williams?"; and (2) "You waited until you took the stand and then you told us about [Simpson, Williams, and Middlebrooks]; right?" (App. at 1475.) The government's implication that the questioning about Shannon's silence was largely innocuous because it focused on Shannon's pre-arrest silence does not accord with the reality that both pre-arrest and post-arrest silence received roughly the same degree of inquiry. More to the point, the number of questions the government asked is not relevant to the inquiry before us. Even if the government had, in fact, asked pages of questions regarding Shannon's pre-arrest silence, the problem remains that it also asked inappropriate questions regarding Shannon's post-arrest silence. *Doyle* does not establish a threshold quantity of improper questioning to qualify as a constitutional violation. Here, the two questions asked by the government regarding Shannon's post-arrest silence violated his Fifth Amendment right to silence, as explained in *Doyle*.

27

C. *Harmless Error Analysis*

Our analysis, however, does not end with the finding of a constitutional error at trial. We must still determine whether the government proved beyond a reasonable doubt that the error did not contribute to the verdict obtained.[17] *Chapman*, 386 U.S. at 24. When the government fails to carry its burden of proof, we must vacate the judgment of conviction and remand for a new trial. That is the result required here.

Viewed in its totality, the evidence against Shannon was largely circumstantial and not "overwhelming," as required by *Davis*.[18]    561 F.3d at 165. "The government

[17] The government argues that *Brecht v. Abrahamson*, 507 U.S. 619 (1993), is instructive, but, as the government itself notes, "*Brecht* was decided on collateral rather than direct review" (Gov't's Br. at 32 (citing *Brecht*, 507 U.S. at 637-38 (holding that constitutional error is harmful under collateral review when that error "had substantial and injurious effect or influence in determining the jury's verdict"))), and consequently is irrelevant to our analysis.

[18] We are not implying, of course, that the evidence against him was insignificant. It certainly was not. The government presented the following persuasive evidence at trial: Shannon's Boost Mobile phone chirped in Eighty Four virtually every time Middlebrooks visited Pittsburgh. Shannon was entrusted with $669,340 to hold for the conspiracy, despite, according to him, being a complete stranger to that conspiracy. And Shannon falsified his logbooks, a violation of federal law in its own right, to hide

conducted months of investigation, listened to thousands of hours of wiretaps, [and] yet had not once heard of Shannon." (Appellant's Opening Br. at 26.) Not one government record revealed a call, text, or even an email between Shannon and anybody else involved in the conspiracy. Without more in the way of corroborating evidence linking Shannon to the conspiracy, the jury's assessment of Shannon's credibility was likely important to the outcome of the case.[19] Because that credibility was undermined by the government's questioning of Shannon about why he had not come forward earlier to the police, we cannot say the constitutional error was harmless. *Chapman* mandates that the government must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained," 386 U.S. at 24, but the government has not done so, and the verdict cannot stand.

---

frequent trips, that, perhaps by sheer coincidence, had him driving through Eighty Four on multiple occasions. Although such evidence may well be sufficient to convict, it is not enough to sustain a conviction when, as in this case, there has been a Fifth Amendment violation and the case depends so heavily on whether one believes the defendant's story.

[19] In the past, we have found "harmless error" in limited circumstances where the government presented additional corroborating evidence at trial. *See Davis*, 561 F.3d at 166. In *United States v. Balter*, 91 F.3d 427, 431 (3d Cir. 1996), for example, the government offered taped conversations substantiating its theory of the case. Similarly, in *United States v. Dunbar*, 767 F.2d 72, 73 (3d Cir. 1985), two bank tellers separately identified the defendant after a surveillance camera captured pictures of him robbing a bank. Here, the government has offered no such evidence.

**III. CONCLUSION**

For the foregoing reasons, we will vacate the District Court's judgment and remand for a new trial consistent with this opinion.