**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-4610
_____

UNITED STATES OF AMERICA

v.

VICTOR LOPEZ
a/k/a
ALEX LOPEZ

Victor Lopez,
            Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-13-cr-00155-001)
District Judge: Honorable Anne E. Thompson
_____

Argued November 3, 2015
_____

Before: McKEE, *Chief Judge*, JORDAN and VANASKIE,
*Circuit Judges*

(Opinion Filed: April 20, 2016)

Steven G. Sanders, Esq.     [ARGUED]
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102


Mark E. Coyne, Esq.
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
        *Counsel for Appellee, United States of America*

Maria K. Pulzetti, Esq.     [ARGUED]
Federal Community Defender Office for the Eastern District
of Pennsylvania
Trial Unit
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106


Brett G. Sweitzer, Esq.
Federal Community Defender Office for the Eastern District
of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA 19106
        *Counsel for Appellant, Victor Lopez*

2

—————————

## OPINION

—————————

VANASKIE, *Circuit Judge*.

As established by *Doyle v. Ohio*, 426 U.S. 610 (1976), the right to remain silent contains an implicit promise that a defendant's post-Miranda silence will not carry adverse consequences. This promise prohibits a prosecutor from impeaching a defendant with his or her post-Miranda silence. Otherwise, a prosecutor could diminish a defendant's credibility by suggesting that a defendant's silence raises suspicion, thereby burdening the defendant's right to remain silent with a costly, unconstitutional penalty. Victor Lopez argues that he bore this cost when the Government impeached him with his post-Miranda silence and that this error satisfies plain error review. We agree. Therefore, we will vacate his conviction and remand for a new trial.

## I.

Victor Lopez was convicted of possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g). The sole contested issue at trial was whether Lopez indeed possessed a gun. In this regard, the jury heard testimony from Lopez and from the arresting officers, Paul Martinez and Miguel Ramos. The jurors were faced with the decision of whether to believe the officers' testimony that they found a gun in Lopez's pocket or to believe Lopez's testimony that the police framed him. In light of this conflicting testimony

3

and the paucity of other evidence, Lopez's credibility was crucial to his defense.

Officers Martinez and Ramos testified fairly consistently regarding their encounter with Lopez and an unidentified man around midnight on September 13, 2012, though there were some discrepancies in their recollection of events. Generally speaking, the officers individually responded to a possible burglary in progress at an apartment building, saw Lopez and an unidentified man about to exit the building, and questioned the men. Eventually, Officer Martinez asked the men to step outside and put their hands against the wall. When Officer Martinez searched Lopez, he saw a gun in Lopez's pocket. Then, while Officer Martinez was handcuffing Lopez, the unidentified man left the scene. The officers then took Lopez to the precinct for booking, where Lopez gave officers the name of his brother, Alex Lopez, rather than his own.

Lopez, on the other hand, testified that the officers framed him for possessing the gun and that he was only at the apartment building to take a woman home after their date that evening. He testified that his friend Pagan had driven him to the apartment building earlier that night, that he had taken a woman named Crystal on a date, and that he had taken Crystal back to her apartment shortly before midnight. Around midnight, Lopez was nearing the apartment's exit at the same time as an unknown, unidentified man. Lopez testified that he saw police officers outside of the apartment building. As he exited, he testified that an officer threw him against the wall. While Lopez was held against the wall, Lopez said he heard the unidentified man tussling with the second officer and that it sounded like the unidentified man ran away. Then, Lopez heard officers say that there was a

4

gun, and the officers told Lopez to identify the man who escaped or else Lopez would be arrested. Lopez testified that he did not know the other man, that he never had the gun, and that he had not seen the gun before. He admitted that when he was taken to the precinct, however, he gave officers his brother's name rather than his own. He also testified that he had prior felony convictions.

Regarding the gun possession charge, Lopez received a Miranda warning on the day of his arrest. After receiving this warning, Lopez did not say that he had been framed by the police until he testified at trial. During the Government's cross-examination, the Government undercut Lopez's testimony with the following exchange:

> Q So essentially you got charged with a gun that you claim you did not possess, correct?
>
> A Yes, sir.
>
> Q You're being wrongfully charged, correct?
>
> A Yes, sir.
>
> Q You're being framed for this gun, right?
>
> A Yes, sir.
>
> Q The next day, did you tell anybody about what happened?
>
> A Tell anyone like who?
>
> Q Anybody. Did you call up Crystal and say, "Hey, guess what happened last night?"

5

A    No, I did not call Crystal.

Q    Okay. Did you tell your friend Pagan who had driven you there?

A    No, I did not speak to no one.

Q    You didn't tell anybody that you were just framed the night before, did you?

A    No, I did not.

Q    How about after the --

A    I got a --

Q    -- next day? At any point, from the next day until just before this trial, did you tell anybody, "I was framed by the police?"

A    Absolutely.

Q    Okay. Who'd you tell?

A    I tell other individuals.

Q    Who?

A    Friends.

Q    Who? Do you have a name?

A    They're not here at the moment.

Q    And where are they?

A    They're at home.

Q    Did you tell them you were on trial today?

A        No, I did not. I don't have no contact with no one but my family.

Q        And you -- have you ever made a complaint against a police officer in the past?

A        No, sir.

Q        Do you know how easy that would be to file a complaint against a --

> [Lopez's Counsel]: Objection to how easy it would be.
> THE COURT: sustained.

(App. 266-68.)

Then, in its closing argument, the Government referred to this exchange and challenged Lopez's credibility on the basis that he did not tell anyone that he had been framed by the police before trial. Specifically, the Government stated:

> Let's think back to defendant's testimony yesterday. He said that Officer Martinez roughed him up, threw him against a wall, punched his face into a wall, and threatened him physically, and also threatened him with sending him to jail. And this made defendant fear for his life and his freedom. But he

7

didn't fear for his freedom enough to do anything about it. Until today, he said nothing about this conduct to anyone who could make a difference.

. . . Wouldn't you expect him to file a complaint with the police about Officer Martinez's conduct, especially since defendant testified that there was a crowd of onlookers that gathered while the arrest was taking place? But he never reported the behavior to the police, to anyone at the jail, to the Prosecutor's Office, to his congressman. He testified that he told a few friends, but he couldn't tell us who they were. He explained that he was in jail and couldn't make phone calls, but he admitted he could speak to his family, and did. And he also admitted that he could write letters. Yet he did nothing to report what he describes as abusive conduct by any -- by an authority figure, by the police.

. . . .

8

An innocent man framed, sitting in jail, and that's all he did until he took the stand yesterday.

Compare all of this to Officer Ramos and Officer Martinez's testimony. The officers' testimony simply makes more sense.

(App. 374-75.)

The jury convicted Lopez of possession of a firearm as a convicted felon.[1] He was sentenced to 70 months' imprisonment. This appeal followed.

---

[1] It appears that the jurors struggled with their assessment of the credibility of the witnesses, sending six questions to the District Court during deliberations, asking:

(1) "Were there any security cameras in use on the night of the occurrence, and what did they show?"
(2) "What items were in Victor's possession packet when he was released from the jail?"
(3) "Is there documentation to prove that Crystal lived in Apartment Number 10 or a rental agreement?"
(4) "Why were the aunt, José Pagan, and Crystal not questioned and called to be witnesses?"

**II.**

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have appellate jurisdiction under 28 U.S.C. § 1291. We review an unpreserved *Doyle* violation for plain error. *See United States v. Shannon*, 766 F.3d 346, 355 n.12 (3d Cir. 2014) (citing *United States v. Balter*, 91 F.3d 427, 441 (3d Cir. 1996)). Under this framework, an appellant must show: "(1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)).

**III.**

On appeal, Lopez argues that the Government violated his due process rights under *Doyle v. Ohio* by impeaching

---

(5) "Is it standard procedure for both policemen to write a report? If only one is required to write a report, is the other required to write a witness statement?"
(6) "Was the weapon checked for fingerprints, including bullets, magazine, and cartridge? If so, what were the results?"

(App. 434-35.)

him with his post-Miranda silence and that this error satisfies plain error review.[2]  Although the Government concedes that one of its cross-examination questions arguably violates *Doyle*, the Government contends that legitimate impeachment evidence offsets any *Doyle* violation and that Lopez cannot satisfy plain error review.[3]  We will begin by discussing the *Doyle* violation before turning to the four-part test for plain error review.

## A.

In *Doyle v. Ohio*, the Supreme Court held that it is a violation of due process to impeach a defendant's testimony, told for the first time at trial, with the defendant's post-Miranda silence.  426 U.S. at 611, 619.  In that case, a state prosecutor sought to discredit the defendant's testimony that he had been framed, which he told for the first time during trial, by inquiring why he did not tell his story earlier.  *See id.*

---

[2] Lopez also argues that his Confrontation Clause rights were violated, but we need not address this argument because we hold that a new trial is required on the basis of the *Doyle* violation.

[3] In its answering brief, the government argued that many of the questions implicating Doyle actually related to a time period after Lopez was arrested but before he received Miranda warnings.  A subsequent submission to expand the record, however, demonstrates that Lopez received Miranda warnings the morning of his arrest, which the government acknowledged in its sur-reply.  We therefore need not address the government's arguments about Doyle rights between arrest and Miranda warnings because those events were essentially contemporaneous in this case.

11

at 613. The State "argue[d] that the discrepancy between an exculpatory story at trial and silence at time of arrest gives rise to an inference that the story was fabricated somewhere along the way." *Id.* at 616. The Supreme Court disagreed. *Id.* at 617-20. In holding that the inference sought to be drawn by the prosecution was improper, the Supreme Court highlighted the "insolubly ambiguous" nature of a defendant's post-Miranda silence and the unfairness that would result from impeaching a defendant's testimony with this silence. *See id.* at 617-18. The Supreme Court emphasized that "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." *Id.* at 618. More specifically, the Supreme Court stated that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.*

As in *Doyle*, Lopez remained silent after his arrest, waiting until trial to proclaim that he was framed for possessing the gun. When the Government cross-examined him, the prosecutor challenged Lopez's defense by repeatedly asking whether he told anyone that he had been framed at an earlier time. Specifically, there were at least three impermissible questions: (1) "did you tell anybody about what happened?" (2) "You didn't tell anybody that you were just framed the night before, did you?" and (3) "At any point, from the next day until just before this trial, did you tell

12

anybody, 'I was framed by the police?'"[4]    (App. 266-67.)
The Government emphasized this exchange in its closing.[5]

_____

[4] In view of the other *Doyle* errors, we need not decide whether the Government's questions regarding whether Lopez told Crystal or Pagan that he had been framed, standing alone, also violate due process.

[5] We have identified at least seven statements in the Government's closing that invite the impermissible inference that Lopez's silence and decision to maintain that silence imply he fabricated his trial testimony:

> (1) "But he didn't fear for his freedom enough to do anything about it."
> (2) "Until today, he said nothing about this conduct to anyone who could make a difference."
> (3) "Wouldn't you expect him to file a complaint with the police about Officer Martinez's conduct, especially since defendant testified that there was a crowd of onlookers that gathered while the arrest was taking place?"
> (4) "But he never reported the behavior to the police, to anyone at the jail, to the Prosecutor's Office, to his congressman."
> (5) "Yet he did nothing to report what he describes as abusive

13

The Government's impermissible cross-examination here is distressingly similar to the questioning in *Doyle*. In both cases, the prosecutor challenged the defendant's silence and failure to tell the police about being framed before testifying at trial. *Cf. Doyle*, 426 U.S. at 613-14. Also in both cases, the questioning was intended to raise the impermissible inference that the defendant fabricated his story sometime before trial and that the defendant's testimony was therefore not credible. *See id.* at 616-17. Moreover, the Government relied on this improper impeachment in closing by inviting the jury to construe Lopez's silence against him and to find that the officers were more credible than Lopez. This impeachment strategy was soundly rejected in *Doyle v. Ohio*.[6] Whether this violation satisfies plain error review, however, is a separate question that we now address.

---

conduct by any -- by an authority figure, by the police."
(6) "An innocent man framed, sitting in jail, and that's all he did until he took the stand yesterday."

(App. 374-75.)

[6] We also note that the Government's closing argument discusses both Lopez's post-Miranda silence and his failure to file a police misconduct report. Although the Government argues that Lopez's failure to file a police misconduct report might not have been motivated by his right to remain silent, and that a defendant's silence must be motivated by a Miranda warning for *Doyle* to apply, the Government's argument here misses the mark. The proper focus is the inference the Government sought to draw from

**B.**

As discussed above, the Government violated *Doyle* by impeaching Lopez's trial testimony with his post-Miranda silence and by inviting the jury to infer that Lopez's testimony was a fabrication based on this silence.  Thus, the first two steps of plain error review are satisfied.  That is, there was "an error or defect" in Lopez's trial, and that error is "clear or obvious, rather than subject to reasonable dispute." *See Puckett*, 556 U.S. at 135.

---

Lopez's post-Miranda silence.  *Cf. Hassine v. Zimmerman*, 160 F.3d 941, 949 (3d Cir. 1998) ("We believe that questions like this ['[y]ou sat for seven months in prison with the knowledge of what was really involved in regard to the his gun, and you just kept it to yourself because your attorney said to keep it to yourself?'] clearly invite the jury—in violation of *Doyle*—to reject Hassine's story and to infer that Hassine's post-arrest silence was a sign of his guilt.").  Here, the Government sought to use Lopez's post-Miranda silence (including his failure to file a police misconduct report) to suggest that Lopez's defense, told for the first time at trial, was a fabrication.  This inference is impermissible.  To find otherwise would allow a prosecutor to circumvent *Doyle* by asking the defendant why he did not take some type of affirmative action in his defense, despite being prohibited from asking why the defendant failed to speak in his defense.  This result would be incongruous.  The implicit promise in Miranda warnings is that a defendant's silence will not be used against him, such that a defendant has the right to remain silent and to maintain that silence by not filing a police misconduct report.

15

The third step of this analysis addresses whether "the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings.'" *Marcus*, 560 U.S. at 262 (quoting *Puckett*, 556 U.S. at 135). Here, there is a reasonable probability that the *Doyle* violation affected the outcome of Lopez's trial. *Marcus*, 560 U.S. at 262. After hearing testimony from the officers and from Lopez, the jury faced a credibility determination: Should they believe the officers' testimony that Lopez possessed a gun, or Lopez's testimony that the officers framed him? As such, Lopez's credibility was integral to his defense, and the Government's repeated references to his post-Miranda silence diminished his credibility.[7] Indeed, the jury struggled with the competing factual testimony here as evidenced by the questions it sent to the District Court attempting to elicit additional facts about

---

[7] Absent this impermissible impeachment, the Government argues that the jury would have questioned Lopez's credibility because of his prior felony convictions and the fact that he initially gave a false name. The Government contends that this legitimate impeachment offsets its impermissible impeachment. We disagree, because the legitimate impeachment evidence merely drew Lopez's general credibility into question and did not create as direct an inference that Lopez's story of being framed was a recent fabrication. The Government's Doyle violation more powerfully created this inference, and it did so improperly by undermining the defendant's exercise of his constitutional rights. We therefore conclude that there is a reasonable probability that this violation affected the outcome of Lopez's trial.

16

the incident.[8]  Because Lopez's defense depended entirely on his credibility as compared to the officers' credibility, we find that the Government's impermissible impeachment of Lopez's testimony diminished his credibility in a manner that created a reasonable probability that this error affected the outcome of his trial.  Thus, the third step of this analysis is satisfied.

The fourth and final step of this analysis is whether "the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Marcus*, 560 U.S. at 262 (quoting *Puckett*, 556 U.S. at 135).  This fourth step of plain error review erects a high hurdle, surmounted only in "those circumstances in which a miscarriage of justice would otherwise result." *United States v. Olano,* 507 U.S. 725, 736 (1993) (internal quotation marks omitted).  This demanding test is met here in view of the fact that the case hinged entirely on the relative credibility of Lopez and the officers, with no corroborating evidence for either side's account; the *Doyle* violation was blatant; and the government's repeated emphasis of the error in closing argument exacerbated the prejudice from the violation.  Under these circumstances, the government's conduct did indeed undermine the fairness,

---

[8] As noted above, the jury asked whether there was any security camera footage, whether Lopez had items on him when he was arrested, whether Crystal lived in the building, why Crystal and Pagan were not called as witnesses, whether there were fingerprints on the gun, and whether standard police reporting practices were followed.  These questions indicate the jury's difficulty reconciling the competing testimony in this case and its concerns about Lopez's testimony.

17

integrity, and reputation of judicial proceedings.[9] Because we find that the four steps of the plain error analysis are satisfied, we will vacate Lopez's conviction and remand for a new trial. [10]

---

[9] We note that the Government's impermissible impeachment with Lopez's post-Miranda silence is particularly egregious for its repeated failure to abide by precedent precluding such cross examination. This type of error unfortunately resurfaces too often, threatening to undermine the integrity of proceedings in our courts. *See, e.g., United States v. Shannon*, 766 F.3d 346, 358 (3d Cir. 2014) (*Doyle* error was not harmless, stating "it is a violation of a defendant's due process rights for a 'prosecutor . . . to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving Miranda warnings at the time of his arrest.'") (quoting *Doyle*, 426 U.S. at 611); *Gov't of Virgin Islands v. Davis*, 561 F.3d 159, 167 (3d Cir. 2009) (holding that the *Doyle* error was not harmless because "the prosecutor's impermissible comments about Davis's failure to provide his exculpatory version of the shooting to the police went to the core of his theory of defense and, as a result, his credibility."); *Woods v. Gov't of Virgin Islands*, 274 F. App'x 191, 194 (3d Cir. 2008) (non-precedential) (holding that the *Doyle* error satisfied plain error review as "the prosecutor's conduct in this case [was] beneath the level of propriety expected of the government.") (internal quotation marks omitted).

[10] While we remain troubled by recurring *Doyle* violations, we wish to commend Assistant United States

## IV. Conclusion

For the foregoing reasons, we will vacate the District Court's judgment of October 20, 2014, and remand for a new trial.

---

Attorney Steven G. Sanders for his forthright acknowledgment of the *Doyle* error during oral argument on this appeal. He was a model of professionalism in apologizing for the error at trial and vowing to take steps to avoid having this type of error recur.