**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-1331, 15-1332, 15-1350, 15-1351
_____

UNITED STATES OF AMERICA

v.

SHAQUIM FREDERICKS, Appellant in 15-1331
CHEFTON C. NEWTON, Appellant in 15-1332
WARKIM GABRIEL, Appellant in 15-1350
ALVIN THOMAS, Appellant in 15-1351

_____

On Appeal from the
District Court of the Virgin Islands
(D.C. Nos. 3:14-cr-00033-001, 004, 002, 003)
District Judge:  Hon. Curtis V. Gomez

_____

Submitted under Third Circuit L.A.R. 34.1(a)
December 12, 2016

Before:  CHAGARES, JORDAN, and HARDIMAN, <u>Circuit</u> <u>Judges</u>.

(Filed: April 7, 2017)
_____

OPINION*
_____

---

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

CHAGARES, Circuit Judge.

On July 23, 2014, a jury found defendants Shaquim Fredericks ("Fredericks"), Clifton Newton ("Newton"), Warkim Gabriel ("Gabriel"), and Alvin Thomas ("Thomas") guilty of conspiracy to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951(a) (Count One); interference with commerce by robbery, in violation of 18 U.S.C. §§ 1951(a) and 2 (Count Two); and conspiracy to possess a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(o) (Count Four). They timely appealed their convictions on various bases. For the reasons that follow, we will affirm in part and vacate and remand in part.

I.

Because we write exclusively for the parties, we set forth only those facts necessary to our disposition.

The defendants were involved in a March 15, 2014 armed robbery of Imperial Jewelers ("Imperial"), a jewelry store located in St. Thomas, United States Virgin Islands. At approximately 8:15 a.m. on March 15, Fredericks, Gabriel, and Thomas (and others) were observed gathering at Fireburn Hill in white t-shirts. At approximately 9:40 a.m., the Virgin Islands Police Department ("VIPD") received a 911 call that seven individuals wearing black clothing, black gloves, and black masks were running to Imperial Jewelers. The individuals entered Imperial, and while some of them held customers and employees at gunpoint, others smashed display cases and took jewelry. The individuals were in the jewelry store for less than one minute.

2

The alarm at Imperial was activated during the robbery. Shortly thereafter, the dispatcher called over the radio that there was an armed robbery in progress and a suspect was fleeing toward Back Street. Another radio call reported that a suspect was heading toward Vester Gade. A third call conveyed that several suspects were fleeing toward Fireburn Hill. At approximately 10:00 a.m., several gunshots were heard coming from the Fireburn Hill area.

Officer Derek Greaves responded to one dispatch and proceeded to Fireburn Hill. On Fireburn Hill, he saw a young, black male, later identified to be Thomas, exiting the bushes. Officer Greaves ordered Thomas to the ground, and Thomas complied. Officer Dora Lyn Theda-Charles ("Officer Charles") was also on the scene. She handcuffed Thomas and took him to her vehicle. Before he was placed in the vehicle he was given warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). Thomas told Officer Charles that he couldn't breathe. Officer Charles rolled down the windows but left Thomas in the car for over an hour. Officer Charles then transported Thomas to the police precinct for booking.

Detective Charles Gumbs also responded to one of the radio dispatches. As he entered the "Savan gut" area, he observed "several black males, all dressed in black" who fled as soon as they saw him. Gabriel Appendix ("Gabriel App.") 272:7–9. He pursued them and eventually ended up in the Catherineberg area. He entered the bushes and found two individuals not named in this case crouching or laying in the bushes. They were wearing dark clothes and were missing their shoes. They appeared to be very sweaty and out of breath. The individuals were both arrested. Detective Gumbs and

3

another officer, Officer Lester Stout proceeded to search the bushes, and Detective Gumbs came upon another individual, later identified to be Newton. Detective Gumbs ordered Newton to raise his hands and, after Newton did so, Detective Gumbs called for Officer Stout over the radio. Officer Stout responded, conducted a pat-down search, and secured Newton. Detective Gumbs continued his search of the area and came upon a pair of gloves, which Newton denied were his. Dark clothing was also found in close proximity to where Newton was hiding. When he was found, Newton did not have shoes on, but shoes were found nearby. At trial, Detective Gumbs testified that Newton was wearing dark clothing when he was found. However, Newton was in fact wearing a white t-shirt. After Newton and the two other individuals were secured, Detective Gumbs returned to the area where he had apprehended the suspects and collected evidence including socks, gloves, masks, shoes, other clothes, bags, jewelry, a firearm, and display racks from the jewelry store.

Officer Joycelyn Lee-Bobb ("Officer Lee-Bobb") also responded to the robbery. She observed "at least five black males" running on Norre Gade. Gabriel App. 221:4. She then pursued two individuals in the direction of Fireburn Hill. These individuals were later identified as Gabriel and Fredericks. While in pursuit, Officer Lee-Bobb realized that she did not have her radio, so she returned to her vehicle to report her location.

Officers Daryl Donovan and Erecedo Lindquist found Gabriel and Fredericks in a shanty in the Catherineberg area. They had responded to the report of the robbery and

were tracking suspects with a K-9 search dog.  In addition to leading them to Gabriel and Fredericks, the K-9 also located bags, handbags, shirts, pants, gloves, and sneakers.

All of the defendants were transported to the police station.  The booking process began at approximately 3:00 p.m. and concluded at approximately 4:00 p.m.  During this time, Thomas told Detective Sehkera Tyson that he wanted to make a statement about the robbery but wanted to do so out of the presence of the other suspects.  At 3:06 p.m., Detective Tyson advised him of his rights and provided him with a form detailing his rights.  He executed the form, indicating that he had read the statement, that it had been read to him, and that he understood his rights.  Thomas was then taken to an interview room.  At 4:26 p.m., Detectives Sophia Rashid and Nigel James again advised Thomas of his Miranda rights.  They also provided him with a form outlining his rights, which he executed.  He also executed a waiver forgoing his right to an attorney.  At no point did Thomas ask for a lawyer.

Thomas then provided a statement incriminating himself and his co-defendants.  The statement provided, in pertinent part:

> The eight of us met . . . and we got dressed, we waited and one of the people that I don't know started running, then we followed that person towards the store.  **Someone** jumped over the counter.  I pushed that person over the counter, then I went in the walk way and started picking up the chain . . . .  Then I heard somebody say, let's go[.]  Then I picked up three cartons of rings.  Then we ran . . . [and] we ended up at Fireburn Hill, we had plans to put the jewelry at my spot and somebody would come pick it up.  We were going up through the bush, some went left some went right and I went straight to my spot. I heard a shot before I reached my spot.  I was at my spot for a couple seconds, I took off my pants, I walked out to the road and an officer stopped me.

5

Thomas Supplemental Appendix ("Thomas Supp. App.") 880.  Thomas also drew a map indicating where he and his co-defendants were found.[1]  Thomas was presented to a Magistrate Judge on the morning of March 17, 2014.

At trial, the evidence introduced included the following.  The sales manager testified that all of the jewelry at Imperial was imported from outside the Virgin Islands.  He also testified that the jewelry recovered by the VIPD was the jewelry that was stolen from Imperial on March 15, 2014.  Video cameras at Imperial captured the robbery, and the video was introduced and played for the jury.  Eyewitness testimony, photographs, and other evidence corroborated the events depicted in the video.  There was also testimony corroborating the gunshots.  Thomas's statement was admitted at trial with a limiting instruction that it was only to be used against Thomas.  See Gabriel App. 609:17–610:6.  The statement was sanitized to replace the names of other individuals with the word "someone" or "person."  See Gov. Br. Gabriel 7.  The defendants objected to the reading of the statement.  See Gabriel App. 609:5–16.

After the lunch break on the second day of trial, the defendants were reentering the courtroom in handcuffs, escorted by the U.S. Marshals service.  The jury was in the courtroom.  At least one juror saw Newton with handcuffs on.  Fredericks was entering

---

[1] Thomas's account differs from that of the Government.  The accounts diverge most notably with respect to what happened at the police station.  According to Thomas, he was told at least four times that if he talked to the police, he could go home.  He stated that he declined to make a statement.  They told him that if he made a statement, he could go home, go to school, have a future, and graduate.  They also told him that his mother was at the station crying.  Thomas eventually said that he would make a statement and was taken to the interview room where he proceeded to do so.  He signed the rights form and the waiver and did not ask for an attorney.  He testified that the officers asked him to draw the fastest route from Coconuts to Fireburn Hill and that he did so.

the courtroom behind Newton, and it is possible that a juror saw him in handcuffs. When the District Court judge "saw that there was an effort to address cuffs," he ordered the jury to leave. Fredericks Appendix ("Fredericks App.") 503:23–24. The period of time during which the jury and the shackled defendants were in the courtroom together was less than a minute. Newton, Fredericks, and Gabriel moved for a mistrial.

At the close of evidence, the District Court gave the following curative instruction:

Any and all security measures taken by the court security staff or the United States [M]arshal[s] during this trial and during breaks are routine. Security measures are not evidence of any kind against the accused. They may not be considered by you as any evidence of the guilt of any defendant.

Fredericks App. 661:6–11.

The Government rested on July 22, 2014, at which point the defendants moved to dismiss all counts, pursuant to Federal Rule of Criminal Procedure 29. The court dismissed Count Three (possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)) and Count Five (possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k)). On July 23, 2014, the jury returned a verdict of guilty on Counts One, Two, and Four against each defendant.

The defendants were sentenced on January 29, 2015. Newton, Gabriel, and Fredericks were each sentenced to 108 months of imprisonment on each of three counts to run concurrently, a three-year term of supervised release, restitution of $678,294.44, and a special assessment of $300. Thomas was sentenced to 85 months of imprisonment

7

on each of three counts to run concurrently, a three-year term of supervised release, restitution of $678,294.44, and a special assessment of $300.

## II.

The District Court exercised jurisdiction over this case pursuant to 48 U.S.C. § 1612(a) and 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## III.

The defendants raise a variety of arguments attacking their convictions. Fredericks presents two issues on appeal: (1) whether the Hobbs Act is unconstitutional as applied to this case, and (2) whether he was denied his due process rights when the jury saw him and Newton shackled in the courtroom. Newton raises two issues on appeal: (1) whether there was sufficient evidence to support his convictions, and (2) whether his due process rights were violated when the jury saw him in shackles. Gabriel also raises two issues on appeal: (1) whether admission of Thomas's statement violated Gabriel's confrontation rights, and (2) whether there was sufficient evidence to support his convictions. Finally, Thomas contends that his confession should have been suppressed.

## A.

Both Thomas and Gabriel challenge the admission of Thomas's statement at trial.

### 1.

Thomas contends that the District Court erred in denying his motion to suppress his statement on several grounds: (1) that his arrest was unlawful because the police lacked probable cause, (2) that his statement was involuntary, and (3) that there was an

8

improper delay in his presentment.[2] The District Court denied the motion to suppress on the ground that Thomas's statement was not involuntary. The District Court also concluded that period of time between Thomas's arrest and his presentment was not "something that [gave] the Court . . . concern" and that 48 hours was "fairly standard, and the Court [didn't] find anything infirm with that." Thomas App. 213:5–7. However, the District Court did not make findings of fact or determinations of law with respect to probable cause for arrest. On appeal, Thomas renews his arguments with respect to probable cause and presentment but does not contest the District Court's determination as to voluntariness.

We will first consider the District Court's conclusion as to presentment. Thomas was presented to a Magistrate Judge within 48 hours of his arrest. In his Amended Motion to Suppress, Thomas argued that "pursuant to the Fourth and [sic] Amendment[] to the United States Constitution, 18 U.S.C. § 3501, McNabb v. United States, 318 U.S. 332[] (1943), and Mallory v. United States, 354 U.S. 449 (1957)" his statement should be suppressed because his right to prompt presentment was violated. Thomas App. 61. As summarized by the Supreme Court,

> [t]he so-called McNabb–Mallory rule, adopted by this Court "[i]n the exercise of its supervisory authority over the administration of criminal justice in the federal courts," McNabb, 318 U.S. at 341, generally rendered inadmissible confessions made during periods of detention that violated the prompt presentment requirement of Rule 5(a) of the Federal Rules of Criminal Procedure. See Mallory, 354 U.S. at 453. Rule 5(a) provides that

---

[2] "We review the denial of a motion to suppress for clear error as to the underlying factual determinations and exercise plenary review over the application of the law to those facts." United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005).

9

a person arrested for a federal offense shall be taken "without unnecessary delay" before the nearest federal magistrate, or before a state or local judicial officer authorized to set bail for federal offenses under 18 U.S.C. § 3041, for a first appearance, or presentment.

United States v. Alvarez-Sanchez, 511 U.S. 350, 354 (1994) (second alteration in original). Section 3501 of Title 18 of the United States Code limits this rule by allowing for the admission of statements that are made voluntarily and within six hours of arrest, provided that a judge concludes that any delay in presentment was not unreasonable. But § 3501 does not prohibit admission of statements made outside the six-hour window. "If the confession occurred before presentment and beyond six hours . . . the court must decide whether delaying that long was unreasonable or unnecessary under the McNabb–Mallory cases, and if it was, the confession is to be suppressed." Corley v. United States, 556 U.S. 303, 322 (2009).

Thomas's argument with respect to presentment is unavailing. The precedent on which he relies applies to defendants in federal custody on federal charges. See Alvarez-Sanchez, 511 U.S. at 359 ("In this case, respondent was under arrest on state narcotics charges at the time he made his inculpatory statement to the Secret Service agents. The terms of § 3501(c) thus did not come into play until respondent was arrested by the agents on a federal charge—after he made the statement. Because respondent's statement was made voluntarily, as the District Court found, nothing in § 3501 authorized its suppression."). At the time he made his confession, Thomas was in territorial custody and, thus, the six-hour requirement does not apply. Thomas attempts to save his argument by invoking Anderson v. United States, 318 U.S. 350 (1943), which provides

10

for the suppression of statements in situations where there is improper collaboration between federal and state officials.  Thomas did not raise this argument in the District Court and is therefore precluded from raising it for the first time on appeal.  United States v. Joseph, 730 F.3d 336, 337 (3d Cir. 2013) ("We hold that for parties to preserve an argument for appeal, they must have raised the same argument in the District Court— merely raising an issue that encompasses the appellate argument is not enough.").  In addition, even if he had raised this argument, it is meritless because he has failed to demonstrate "improper collaboration between federal and state or local officers." Alvarez-Sanchez, 511 U.S. at 359 (citing Anderson, 318 U.S. 350).

Thomas also argues that his statement should be suppressed because the VIPD did not have probable cause to arrest him.  The Fourth Amendment prohibits "unreasonable searches and seizure."  U.S. Const. amend. IV.  "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."  Devenpeck v. Alford, 543 U.S. 146, 152 (2004).  "[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality."  New York v. Harris, 495 U.S. 14, 19 (1990).  Not "all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Wong Sun v. United States, 371 U.S. 471, 487–88 (1963).  When a confession is "sufficiently an act of free will to purge the primary taint of the unlawful [action]," it may be admissible.  Id. at 486.  The "apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made

11

has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" Id. at 488 (quoting Maguire, Evidence of Guilt, 221 (1959)); see also United States v. Butts, 704 F.2d 701, 703 (3d Cir. 1983) ("In deciding whether the district court erred by admitting [the defendant's] confession we must ask two questions. First, we must ask whether the authorities had probable cause to arrest [the defendant] . . . . Second, we must ask whether, assuming the authorities lacked probable cause, the confession should have been excluded as the fruit of a poisonous tree, or whether some intervening event had purged the taint of the improper arrest thereby rendering the confession admissible.").

Here, the District Court failed to make any factual determinations or conclusions of law on the record with respect to probable cause.[3] A district court is not required to make written factual findings, however Federal Rule of Criminal Procedure 12(d) requires that "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d). Because the District Court did not make any findings on the record as to probable cause or articulate a conclusion of law with respect to whether there was probable cause for arrest, we will vacate the District Court's order denying the motion to suppress and remand for the District Court to determine whether there was probable cause for Thomas's arrest and, if not, whether his statement was sufficiently attenuated from the unlawful arrest.

2.

---

[3] Although the District Court noted that "the weight of credibility is on the side of the government," this comment was made in the context of discussing the circumstances under which Thomas's statement was made. Thomas App. 208:20-21.

12

Gabriel argues that introduction of Thomas's statement violated his Sixth Amendment right to confrontation. Gabriel argues that even though Thomas's statement was sanitized, when placed in the context of other evidence admitted at trial, the statement incriminates him. More specifically, in his statement, Thomas mentioned that he met up with the others involved with the robbery at around 9:00 a.m. At trial, a neighbor testified that she saw Gabriel, Fredericks, and Thomas with others at approximately 9:00 a.m. Thomas also indicated that the plan was devised at Charlotte Amalie High School, and the neighbor testified that Gabriel and Fredericks were students there. Gabriel argues that the jury could connect Thomas's statement to this other evidence and conclude that Gabriel was one of the people referred to in Thomas's statement. Gabriel argues that admission of the statement in light of the other testimony offered at trial violates his Sixth Amendment rights.

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Supreme Court has interpreted the Sixth Amendment to include the right to cross-examine witnesses. See Pointer v. Texas, 380 U.S. 400, 404 (1965). In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that, even with a limiting instruction, "the introduction of a non-testifying defendant's out-of-court statement, which directly implicated his co-defendant by name, violated the Confrontation Clause right of the co-defendant." United States v. Hardwick, 544 F.3d 565, 572 (3d Cir. 2008). The Court found a limiting instruction to be inadequate because it concluded that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is

13

so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton, 391 U.S. at 135. Following Bruton, in Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court considered the introduction of a redacted confession made by a co-defendant. This confession was "redacted to omit any reference to the defendant, but the defendant [was] nonetheless linked to the confession by evidence properly admitted against him at trial." Richardson, 481 U.S. at 202. The trial court had also issued a limiting instruction to the jury. The Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211. The Court distinguished Richardson from Bruton on the grounds that the confession in Bruton expressly identified the defendant, whereas in Richardson the confession "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." Id. at 208. In Richardson, the Supreme Court noted that it "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." Id. at 211 n. 5.

The Court addressed that question in Gray v. Maryland, 523 U.S. 185 (1998). In Gray, a co-defendant's confession was redacted to omit the names of two co-defendants. In place of the co-defendants' names, there were "blank white spaces separated by commas." Id. at 189. The district court gave limiting instructions directing the jury to consider the statement against the confessing co-defendant only. The Court concluded

14

that "redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol, still falls within Bruton's protective rule." Id. at 192. The Court observed that "a jury will often react similarly to an unredacted confession and a confession redacted in this way, for the jury will often realize that the confession refers specifically to the defendant." Id. at 193. In addition, the Court surmised that "the obvious deletion may well call the jurors' attention specially to the removed name. By encouraging the jury to speculate about the reference, the redaction may overemphasize the importance of the confession's accusation—once the jurors work out the reference." Id. The Court concluded that the redacted statement in Gray was like the statements in Bruton because it was "directly accusatory" and, thus, was "powerfully incriminating." Id. at 194. On the other hand, the statement in Richardson was not "directly accusatory evidence . . . for it [did] not point directly to a defendant at all." Id. The crucial difference, the Court concluded, is the the kind of inference that a jury must make to connect a redacted statement to the co-defendant:

> Richardson's inferences involved statements that did not refer directly to the defendant himself and which became incriminating "only when linked with evidence introduced later at trial." The inferences at issue here involve statements that, despite redaction, obviously refer directly to someone, often obviously the defendant, and which involve inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial. Moreover, the redacted confession with the blank prominent on its face, in Richardson's words, "facially incriminat[es]" the codefendant. Like the confession in Bruton itself, the accusation that the redacted confession makes "is more vivid than inferential incrimination, and hence more difficult to thrust out of mind."

Id. at 196 (citations omitted) (quoting Richardson, 481 U.S. at 208).

15

The parties also cite to several of this Court's cases including Hardwick; Priester v. Vaughn, 382 F.3d 394 (3d Cir. 2004); and United States v. Richards, 241 F.3d 335 (3d Cir. 2001). We agree with the Government that the facts of this case are most similar to those in Richardson and Priester. In Priester, as in this case and unlike in Gray, the statement was "redacted to replace all references to Priester and other participants in the shootings with words such as 'the other guy,' 'someone,' 'someone else,' 'the guy,' and 'another guy.'" Priester, 382 F.3d at 399. In addition, as in this case, there were many perpetrators involved in the crime in Priester, such that "the phrases 'the other guy' or 'another guy' [were] bereft of any innuendo that tie[d] them unavoidably to Priester." Id. at 401. Although there was evidence introduced at other points in the trial that might connect Gabriel to Thomas's confession, as we held in Priester, "where ascertaining the identity of a co-defendant in a redacted statement requires an inference drawn from linking other evidence to the statement, the risk that the jury cannot follow limiting instructions is not sufficiently substantial to violate the Sixth Amendment." 382 F.3d at 400 (citing Richardson, 481 U.S. at 208). Before the admission of the statement and during the jury charge, the District Court instructed the jury that Thomas's statement was not to be used against anyone but Thomas. In light of this instruction and the type of redactions made to Thomas's statement, we conclude that the risk of the jury not following the limiting instruction was not sufficiently substantial to violate Gabriel's Sixth Amendment right and we will affirm the District Court with respect to this issue.

16

B.

Both Newton and Gabriel argue that there was insufficient evidence to support their convictions. They were convicted of conspiracy to interfere with commerce by robbery, in violation of 18 U.S.C. § 1951(a) (Count One); interference with commerce by robbery, in violation of 18 U.S.C. §§ 1951(a) and 2 (Count Two); and conspiracy to possess a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(o) (Count Four).[4]

Newton argues that "[t]he prosecutor presented no evidence that directly [linked] Newton to the crimes he was charged for." Newton Br. 11. He points out that there was no DNA evidence linking him to the crime, no eyewitness placing him at the crime scene, and no weapons found on him when he was arrested. According to Newton, the only witness that tied him to the crime was Detective Gumbs, who incorrectly testified at trial that Newton was wearing dark clothes when he found him in the bushes.

Gabriel also argues that there was insufficient evidence to support his conviction.[5] No witnesses testified that they saw Gabriel enter or exit Imperial. The eyewitnesses

---

[4] The standard for challenging the sufficiency of the evidence is "highly deferential, and we will overturn a verdict only 'if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'" United States v. Caraballo-Rodriguez, 726 F.3d 418, 430–31 (3d Cir. 2013) (quoting United States v. Coleman, 811 F.2d 804, 807 (3d Cir. 1987)).

[5] The Government argues that Gabriel has forfeited his sufficiency argument because he failed to develop it adequately. See Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 202–03 (3d Cir. 2004) ("[A]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court." (quoting Laborers' Int'l Union v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994))). Gabriel did not provide thorough briefing on his sufficiency

17

who testified could not identify any of the robbers because they were all wearing masks. Seven masks were recovered by VIPD, but forensic analysis did not match any of the hairs or fibers to Gabriel. One of the hairs recovered from one of the masks was from a Caucasian individual.

Count One charges conspiracy to interfere with commerce by robbery in violation of 18 U.S.C. § 1951(a) (Hobbs Act robbery). Section 1951(a) provides,

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). To prove interference with commerce by robbery, "the government must show that (1) the defendant committed 'robbery or extortion' or attempted or conspired to do so, and (2) that conduct 'obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce.'" United States v. Walker, 657 F.3d 160, 178–79 (3d Cir. 2011) (quoting 18 U.S.C. § 1951(a)). To establish that a conspiracy existed, "the government must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal. The government may prove these elements entirely by circumstantial evidence." United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999) (footnote and citation omitted). Indeed, "[t]he existence of a conspiracy 'can be inferred from evidence of related facts and circumstances from which it appears as a reasonable

argument. However, he did address it in his opening brief and articulated an argument in favor of his position. His argument is not forfeited, but it is meritless.

18

and logical inference, that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.'" Id. (quoting United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986)). Here, there is "substantial evidence from which any rational trier of fact could find guilty beyond a reasonable doubt," United States v. Iglesias, 535 F.3d 150, 155 (3d Cir. 2008), that both Newton and Gabriel conspired to and in fact committed Hobbs Act robbery.

At trial, the Government introduced evidence that a group of men were congregating near Imperial prior to the robbery. Video surveillance showed a group of men dressed similarly in masks, gloves, and dark clothing enter Imperial together. While some men held patrons and employees of Imperial at gunpoint, others smashed jewelry cases, took the jewelry, and stuffed it into bags. Witnesses also corroborated the video surveillance. Testimony revealed that the jewelry was imported into the Virgin Islands. Based on this and other evidence offered at trial, a reasonable jury could conclude that this robbery was the result of cooperative planning and execution and, thus, that there existed a conspiracy to commit Hobbs Act robbery and that the Hobbs Act robbery did, in fact, take place.

Additional evidence introduced at trial could lead a reasonable jury to conclude that both Newton and Gabriel were part of the conspiracy and execution of the robbery, thereby supporting their convictions on Counts One and Two. As to Newton, he was apprehended by Detective Gumbs, who responded to the report of the robbery at Imperial. Detective Gumbs observed "several black males, all dressed in black." Newton Appendix 31. When the men saw Detective Gumbs, they started running. One

19

of the men running was wearing "a white stocking cap [and] black jeans" and another was wearing a white shirt and jeans and had his hair in a ponytail. Newton Supplemental Appendix 186. Detective Gumbs continued pursuing the suspects to Fireburn Hill and into the bushes in the Catherineberg area. Officers found clothing, handbags, shirts, pants, gloves, sneakers, and clothing. Newton was found in the bushes. Detective Gumbs testified that Newton's hair was braided and that Newton was wearing dark clothing. Newton was found next to a pair of gloves, which Newton quickly disavowed were his. In the vicinity of where Newton was found, officers also recovered jewelry, and the store manager recognized this jewelry as having been from Imperial. Collectively, this evidence is sufficient for a reasonable jury to conclude that Newton participated in Hobbs Act robbery.

With respect to Gabriel, he was identified as being among a group of men who were seen congregating near Imperial before the robbery took place. At the time, he was wearing red shorts and a white t-shirt. When the police found him, he was wearing the same clothing. Although the people who robbed Imperial were wearing dark clothing, dark clothing was found in Gabriel's vicinity. Accordingly, the jury could reasonably conclude that he was wearing the black clothing and had taken it off. The Government also offered evidence that within the vicinity of where the police found Gabriel, they found masks, bags with jewelry, firearms, and gloves. Such circumstantial evidence is sufficient for a jury to conclude that Gabriel acted in concert with the other co-defendants to rob Imperial.

20

Finally, sufficient evidence was presented at trial for a reasonable jury to have found Gabriel and Newton guilty of Count Four, conspiracy to possess a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(o). To obtain a conviction under 18 U.S.C. § 924(o), the government must show that a conspiracy existed to commit a crime of violence that entailed the use or carry of a firearm or the possession of a firearm in furtherance of the crime. See 18 U.S.C. § 924(o) and (c). At trial, evidence showed that the defendants brandished firearms at Imperial during the course of the robbery. In addition, witnesses testified that shots were fired shortly after the robbery in the area of Fireburn Hill. Accordingly, a reasonable jury could conclude that a firearm was used, carried, or possessed during the robbery. We have held that "Hobbs Act robbery committed while brandishing a firearm [is] a crime of violence." United States v. Robinson, 844 F.3d 137, 144 (3d Cir. 2016) (emphasis removed). This evidence, in conjunction with the evidence (discussed above) supporting the conspiracy charges is sufficient for a reasonable jury to have found Newton and Gabriel guilty of conspiracy to possess a firearm in furtherance of a crime of violence.

C.

On appeal, Fredericks challenges the constitutionality of the Hobbs Act. Because he did not raise this issue before the District Court, the standard of review is plain error. Gov't of Virgin Islands v. Vanterpool, 767 F.3d 157, 162 (3d Cir. 2014). Federal Rule of Criminal Procedure 52(b) provides this Court with limited authority to consider and correct errors that were forfeited because they were not raised in the District Court.

21

Under this standard, "an appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an 'error'; (2) the error is 'clear or obvious, rather than subject to reasonable dispute'; (3) the error 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings'; and (4) 'the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"

Id. at 162 (quoting United States v. Marcus, 560 U.S. 258, 262 (2010)). For an error to be "clear or obvious," it must be clear under current law. Id. (citing United States v. Olano, 507 U.S. 725, 731–37 (1993)). In other words, "if the statute was unconstitutional, then the District Court would have committed error when it applied the statute; but even so, we could reverse only if the error were plain under current law." Id.

Fredericks raises two challenges to the Hobbs Act. First, he argues that application of the Hobbs Act to the facts of this case would exceed Congress's power to legislate under the Commerce Clause. Fredericks asserts that under United States v. Lopez, 514 U.S. 549 (1995), and its progeny, United States v. Morrison, 529 U.S. 598 (2000), Jones v. United States, 529 U.S. 848 (2000), and National Federation of Independent Business v. Sebelius, 567 U.S. 519 (2012), Congress's power to legislate under the Commerce Clause is limited to regulation of "channels of interstate commerce," "instrumentalities of interstate commerce," and "activities that substantially affect interstate commerce." Fredericks Br. 7. Fredericks argues that "[i]ntrastate robbery of a retail store does not implicate channels or instrumentalities of interstate commerce" nor does it "substantially affect[] interstate commerce." Id. Accordingly, he argues that "when the Hobbs Act is applied to the facts of this case, its application would be beyond the bounds of the Commerce Clause." Id.

22

Under current law, application of the Hobbs Act in this case is not plainly unconstitutional. "[W]e have already rejected the argument that Lopez and its progeny require proof of a 'substantial effect' on commerce in an individual case in order to show a Hobbs Act violation." United States v. Urban, 404 F.3d 754, 766 (3d Cir. 2005); see also United States v. Powell, 693 F.3d 398, 401–06 (3d Cir. 2012); United States v. Walker, 657 F.3d 160, 177–84 (3d Cir. 2011); United States v. Clausen, 328 F.3d 708, 710–11 (3d Cir. 2003). We only require "proof of a de minimis effect on interstate commerce" in order to support a conviction under the Hobbs Act. Powell, 693 F.3d at 402 (quoting Walker, 657 F.3d at 180). The effect on interstate commerce may be "slight, subtle or even potential." United States v. Haywood, 363 F.3d 200, 210 (3d Cir. 2004) (quoting Jund v. Town of Hempstead, 941 F.2d 1271, 1285 (2d Cir. 1991)). This requirement is met if the Government proves that the establishment that was robbed sold goods that traveled in interstate commerce. See id. at 209–11. Here, it was established that Imperial purchased all of its goods from outside the Virgin Islands and that approximately 350 of these items (valued at over $2 million) were stolen during the robbery. Because Imperial imported goods from outside the Virgin Islands, the interstate commerce requirement is satisfied and the Hobbs Act is not unconstitutional as applied to the facts of this case.

Second, Fredericks argues that "to allow an application of the Hobbs Act to the facts of [this] case would transform Hobbs Act robbery into a general police power the likes of which has been repeatedly rejected by the Supreme Court . . . and thus violates the Tenth Amendment." Fredericks Br. 8. The Tenth Amendment provides that "[t]he

23

powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Fredericks argues that the power to regulate local criminal activity lies at the heart of the police powers reserved to the states. See Fredericks Br. 31–32 (citing Bond v. United States, 134 S. Ct. 2077 (2014)).

Fredericks and the Government disagree as to whether or not the Tenth Amendment applies to the Virgin Islands. We need not address this argument because we conclude that the Hobbs Act, as applied to this case, does not violate the Tenth Amendment. Under the Commerce Clause, Congress is delegated the power to regulate interstate commerce. The Hobbs Act requires a nexus to interstate commerce and is, therefore, a valid exercise of federal government power under the Commerce Clause. The Tenth Amendment does not prevent the federal government from enforcing a validly enacted federal law. See, e.g., United States v. Bailey, 990 F.2d 119, 126 (4th Cir. 1993) ("The Hobbs Act is a well recognized federal statute, and the Tenth Amendment does not prohibit the federal government from enforcing its laws, even when there are state laws addressing the same criminal act."); United States v. Jarrett, 705 F.2d 198, 203 (7th Cir. 1983) ("The Hobbs Act presents no unconstitutional intrusion upon the sovereignty of the states and, thus, is a constitutional exercise of the commerce power."); Carbo v. United States, 314 F.2d 718, 733 (9th Cir. 1963) ("The contention that § 1951 is not within the power of Congress and contravenes the Tenth Amendment was refuted . . . ."). Because Congress enacted the Hobbs Act in valid exercise of its constitutional authority, application of the Hobbs Act to this case does not violate the Tenth Amendment.

24

Because application of the Hobbs Act in this case is not unconstitutional, we will affirm Fredericks's convictions under Counts One and Two for violation of the Hobbs Act. In addition, we will affirm his conviction under Count Four, for which the Hobbs Act violation was the predicate.

D.

Fredericks and Newton both contend that their Due Process rights were violated during trial because at least one juror saw at least one of them in handcuffs.[6] Newton argues that his Sixth and Fourteenth Amendment rights were violated because the jury saw him in handcuffs, which "depicted Newton as a dangerous criminal, despite the fact that the government had not proven him to be guilty at that point." Newton Br. 15.[7] Newton moved for severance, and the District Court denied his motion. Fredericks argues that his Fifth and Fourteenth Amendment rights were violated because the jury saw Newton and possibly Fredericks in handcuffs.[8] Fredericks moved for a mistrial, and the District Court denied his motion.

---

[6] We exercise plenary review over constitutional challenges presented on appeal. Gov't of Virgin Islands v. Davis, 561 F.3d 159, 163 (3d Cir. 2009).

[7] The Government argues that Newton has forfeited the issue because he failed to develop it sufficiently, devoting only two sentences to the argument in his brief and citing no case law. Gov't (Newton) Br. 27 (citing Skretvedt, 372 F.3d at 202–03 ("[A]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court." (quoting Laborers' Int'l Union, 26 F.3d at 398))). Although Newton did not provide much briefing on the issue, we will not consider it forfeited. However, we also find it to be without merit.

[8] Fredericks argues that "[t]he State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" Fredericks Br. 36 (quoting Deck v. Missouri, 544 U.S. 622, 635 (2005)). However, this standard applies "where a court, without adequate justification orders the defendant to wear shackles that will be seen by the jury." Deck, 544 U.S. at 635. In such a case, "the

25

"[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." Deck v. Missouri, 544 U.S. 622, 629 (2005). At issue in this case is whether a brief, inadvertent observation of a defendant in handcuffs offends a defendant's constitutional rights. We have held that "[t]he fact that jurors may briefly see a defendant in handcuffs is not so inherently prejudicial as to require a mistrial." United States v. Chrzanowski, 502 F.2d 573, 576 (3d Cir. 1974). Likewise, other Courts of Appeals have held that "brief, inadvertent observation of a defendant in custody does not compel reversal in the absence of an affirmative showing of actual prejudice." United States v. Halliburton, 870 F.2d 557, 561 (9th Cir. 1989); see also United States v. Olano, 62 F.3d 1180, 1190 (9th Cir. 1995) ("Because a jury's brief or inadvertent glimpse of a defendant in physical restraints is not inherently or presumptively prejudicial to a defendant, Olano must demonstrate actual prejudice to establish a constitutional violation. Olano did not examine the jury and has adduced no other evidence probative of prejudice. He has failed to establish actual prejudice." (citations and footnote omitted)); United States v. Pina, 844 F.2d 1, 8 (1st Cir. 1988). The concern of prejudice here is further mitigated by the fact that the District Court gave the jury an instruction cautioning the jury not to draw any inferences from the employment of security practices. Cf. Wright v. Texas, 533 F.2d 185, 188 (5th Cir.

---

defendant need not demonstrate actual prejudice to make out a due process violation." Id. Here, Fredericks "preserved this issue for appellate review by asking for a mistrial." Fredericks Br. 35. We review the denial of this motion for a mistrial for abuse of discretion. United States v. Rivas, 493 F.3d 131, 139 (3d Cir. 2007).

1976) ("It must be assumed that rational jurors would understand and follow a proper instruction that handcuffing persons in custody for transportation to and from the courtroom is a reasonable precaution that in no way reflects upon the presumption of innocence or the individual propensities of any defendant.").

Here, the jurors may have only briefly seen Newton and perhaps Fredericks in shackles, and the District Court gave an appropriate jury instruction. Additionally, neither Newton nor Fredericks has demonstrated "clear and substantial prejudice resulting in a manifestly unfair trial." United States v. Reicherter, 647 F.2d 397, 400 (3d Cir. 1981). Accordingly, we will affirm Newton's and Fredericks's convictions.

## IV.

For the foregoing reasons, the District Court will be affirmed in part and vacated and remanded in part for proceedings not inconsistent with this opinion.